**Sergeant Perry WATKINS,
Plaintiff–Appellant,**

v.

**UNITED STATES ARMY, et al.,
Defendants–Appellees.**

No. 85–4006.

United States Court of Appeals,
Ninth Circuit.

Argued En Banc and Submitted
Oct. 12, 1988.

Decided May 3, 1989.

---

Before GOODWIN, Chief Judge,
SCHROEDER, PREGERSON,
ALARCON, NELSON, CANBY,
NORRIS, BEEZER, HALL,
O'SCANNLAIN, and TROTT, Circuit
Judges.

PREGERSON, Circuit Judge:

The United States Army denied Sgt. Perry J. Watkins reenlistment solely because he is a homosexual. The Army refused to reenlist Watkins, a 14–year veteran, even though he had been completely candid about his homosexuality from the start of his Army career, even though he is in all respects an outstanding soldier, and even though the Army, with full knowledge of his homosexuality, had repeatedly permitted him to reenlist in the past. The Army did so despite its longstanding policy that homosexuality was a nonwaivable disqualification for reenlistment. The issue before the en banc court is whether the Army may deny reenlistment to Watkins solely because of his acknowledged homosexuality.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

In August 1967, at the age of 19, Perry Watkins was drafted into the United States Army. In filling out the Army's preinduction medical form, he marked "yes" in response to a question asking whether he had homosexual tendencies. The Army nonetheless found Watkins "qualified for admission" and inducted him into its ranks.

During Watkins' initial three-year tour of military duty, he served in the United States and Korea as a chaplain's assistant, personnel specialist, and company clerk. A year after his induction, in 1968, Watkins signed an affidavit stating that he had been a homosexual from the age of 13 and that, since his enlistment, he had engaged in sodomy with two other servicemen, a crime under military law. The Army, which received this affidavit as part of a criminal investigation into Watkins' sexual conduct,

James E. Lobsenz, Wolfe, Lobsenz & Cullen, American Civil Liberties Union–Washington State, Seattle, Wash., for plaintiff-appellant.

E. Roy Hawkens, Asst. Atty. Gen., Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

---

1. These facts are taken largely from this court's opinion in *Watkins v. United States Army,* 847 F.2d 1329, 1330–34 (9th Cir.1988), as well as from other prior opinions in this case. *See* 721 F.2d 687 (9th Cir.1983); 551 F.Supp. 212 (W.D. Wash.1982); 541 F.Supp. 249 (W.D.Wash.1982).

dropped the investigation because of insufficient evidence.

When his first enlistment period expired in 1970, Watkins received an honorable discharge, but his reenlistment eligibility code was listed as "unknown." In 1971, Watkins requested correction of the reenlistment designation and the Army corrected the code to category 1, "eligible for reentry on active duty." Shortly thereafter, he reenlisted for a second three-year term. In 1972, Watkins was denied a security clearance because of his homosexuality, and the Army again investigated him for allegedly committing sodomy and again terminated the investigation for insufficient evidence. Following another honorable discharge in 1974, the Army accepted Watkins' application for a six-year reenlistment.

In 1975, the Army convened a board of officers to determine whether Watkins should be discharged because of his homosexual tendencies. On this occasion his commanding officer, Captain Bast, testified that Watkins was "the best clerk I have known," that he did "a fantastic job—excellent," and that Watkins' homosexuality did not affect the company. A sergeant testified that Watkins' homosexuality was well-known but caused no problems and generated no complaints from other soldiers. The four officers on the board unanimously found that "Watkins is suitable for retention in the military service" and stated, "In view of the findings, the Board recommends that SP5 Perry J. Watkins be retained in the military service because there is no evidence suggesting that his behavior has had either a degrading effect upon unit performance, morale or discipline, or upon his own job performance. SP5 Watkins is suited for duty in administrative positions and progression through Specialist rating." The board's recommendation became the final decision of the Secretary of the Army.

In November 1977, the United States Army Artillery Group (the USAAG) granted Watkins a security clearance for information classified as "Secret." His application for a position in the Nuclear Surety Personnel Reliability Program (the PRP), however, was initially rejected because his records—specifically, his own admissions—showed that he had homosexual tendencies. After this initial rejection, Watkins' commanding officer in the USAAG, Captain Pastain, requested that Watkins be requalified for the position. Captain Pastain stated, "From daily personal contacts I can attest to the outstanding professional attitude, integrity, and suitability for assignment within the PRP, of SP5 Watkins. In the 6 months he has been assigned to this unit SP5 Watkins has had no problems what-so-ever in dealing with other assigned members. He has, in fact, become one of our most respected and trusted soldiers, both by his superiors and his subordinates." An examining Army physician concluded that Watkins' homosexuality appeared to cause no problem in his work, and the decision to deny Watkins a position in the Nuclear Surety Personnel Reliability Program was reversed.

Watkins worked under a security clearance without incident until he again stated, in an interview on March 15, 1979, that he was homosexual. This prompted yet another Army investigation which, in July 1980, culminated in the revocation of Watkins' security clearance. As the notification of revocation makes clear, the Army based this revocation on Watkins' 1979 admission of homosexuality, on medical records containing Watkins' 1968 affidavit stating that he had engaged in homosexual conduct, and on his history of performing (with the permission of his commanding officer) as a female impersonator in various revues. The Army did not rely on any evidence of homosexual conduct other than Watkins' 1968 affidavit. In October 1979, the Army accepted Watkins' application for another three-year reenlistment.

In 1981 the Army promulgated Army Regulation (AR) 635–200, chpt. 15, which mandated the discharge of all homosexuals regardless of merit. Pursuant to this new discharge regulation, another Army board convened to consider discharging Watkins. Although this board explicitly rejected the evidence before it that Watkins had engaged in homosexual conduct after 1968, the board recommended that Watkins be separated from the service "because he has

stated that he is a homosexual." Major General Elton, the discharge authority overseeing the board, approved this finding and recommendation and directed that Watkins be discharged.[2]

In May 1982, after the Army board voted in favor of Watkins' discharge, but before the discharge actually issued, District Judge Rothstein enjoined the Army from discharging Watkins on the basis of his statements admitting his homosexuality. 541 F.Supp. at 259.[3] The district court reasoned that the discharge proceedings were barred by the Army's regulation against double jeopardy, AR 635–200, ¶ 1–19(b), because they essentially repeated the discharge proceedings of 1975. *Id.* at 258–59.[4]

During oral argument before the district court, counsel for the Army declared that if the Army were enjoined from discharging Watkins, it would deny Watkins reenlistment, pursuant to AR 601–280, ¶ 2–21(c),[5] when his current tour of duty expired in October 1982.[6] This reenlistment regulation, which was promulgated in 1981 along with the discharge regulation AR 635–200,

chpt. 15, is simply a clarification of the earlier regulation which had always made homosexuality a nonwaivable disqualification for reenlistment. The district court nonetheless enjoined Watkins' discharge, and the Army fulfilled its promise by rejecting Watkins' reenlistment application "[b]ecause of self admitted homosexuality as well as homosexual acts."

On October 5, 1982, the district court enjoined the Army from refusing to reenlist Watkins because of his admitted homosexuality, holding that the Army was equitably estopped from relying on the nonwaivable disqualification provisions of AR 601–280, ¶ 2–21(c). *Watkins v. United States Army,* 551 F.Supp. 212, 223 (W.D. Wash.1982).[7] The Army reenlisted Watkins for a six-year term on November 1, 1982, with the proviso that the reenlistment would be voided if the district court's injunction were not upheld on appeal.

While the Army's appeal of the district court injunction was pending, the Army rated Watkins' performance and professionalism. He received 85 out of 85 possible points. His ratings included perfect

2. Major General Elton, on his own initiative, made an additional finding that Watkins had engaged in homosexual acts with other soldiers. The district court ruled both that Major General Elton lacked the regulatory authority to make supplemental findings, *Watkins v. United States Army,* 541 F.Supp. 249, 259 (W.D.Wash.1982), and that the evidence presented at the discharge hearing could not support a specific finding that Watkins had engaged in any homosexual conduct after 1968. *Id.* at 257. The Army has not contested either of these rulings, and, on appeal, cites only Watkins' 1968 affidavit as evidence of homosexual conduct.

3. Watkins had originally brought suit in August 1981 to have his security clearance reinstated, alleging various constitutional violations. After receiving notice that discharge proceedings would be convened, he amended his complaint in October to seek an injunction against his discharge. The district court declined to reach the issue whether the Army could revoke Watkins' security clearance, reasoning that the issue was not yet ripe because Watkins had an administrative appeal pending. *See* 541 F.Supp. at 259; *see also Watkins v. United States Army,* 551 F.Supp. at 223. Watkins' security clearance dispute is thus not before us on appeal.

4. The district court held that the evidence could not support a finding that Watkins engaged in

homosexual conduct subsequent to the 1975 discharge proceedings and that the Army's double jeopardy provision barred the Army from basing Watkins' discharge on statements that merely reiterated what Watkins had stated in the 1975 discharge proceedings—that he was homosexual. *See* 541 F.Supp. at 257–59.

5. This reenlistment regulation, unlike the new discharge regulation, is simply a clarification of the pre–1981 reenlistment regulation. Throughout Watkins' 14 years in the Army, homosexuality was always a nonwaivable disqualification for reenlistment.

6. At that time, the regulation appeared at ¶ 2–24(c). However, for convenience, this opinion will refer to all Army regulations by the paragraph numbers used in the Army's September 15, 1986 update, unless a different date is explicitly noted.

7. This case does not involve a claim that courts can exercise general review of the Army's reenlistment decisions. Watkins does not seek a judicial determination of the merits of his reenlistment application. He merely seeks a judicial determination that the Army must consider his reenlistment application on its merits without regard to his homosexuality. *See* 551 F.Supp. at 218.

scores for "Earns respect," "Integrity," "Loyalty," "Moral Courage," "Self-discipline," "Military Appearance," "Demonstrates Initiative," "Performs under pressure," "Attains results," "Displays sound judgment," "Communicates effectively," "Develops subordinates," "Demonstrates technical skills," and "Physical fitness." His military evaluators unanimously recommended that he be promoted ahead of his peers. The Army's written evaluation of Watkins' performance and potential stated:

SSG Watkins is without exception, one of the finest Personnel Action Center Supervisors I have encountered. Through his diligent efforts, the Battalion Personnel Action Center achieved a near perfect processing rate for SIP-DERS transactions. During this training period, SSG Watkins has been totally reliable and a wealth of knowledge. He requires no supervision, and with his "can do" attitude, always exceeds the requirements and demands placed upon him. I would gladly welcome another opportunity to serve with him, and firmly believe that he will be an asset to any unit to which he is assigned.

SSG Watkins should be selected to attend ANCOC and placed in a Platoon Sergeant position. [Rater's Evaluation of Watkins' performance and potential.]

SSG Watkins' duty performance has been outstanding in every regard. His section continues to set the standard within the Brigade for submission of accurate, timely personnel and financial transactions. Keeping abreast of ever-changing personnel regulations and directives, SSG Watkins has provided sound advice to the commander as well as to the soldiers within the command. His suggestion to separate S–1 and Personnel Action Center functions and to colocate the Personnel Action Center with the Company Orderly Rooms was

adopted and immediately resulted in improved service by both offices. SSG Watkins' positive influence has been felt throughout the Battalion and will be sorely missed.

SSG Watkins' potential is unlimited. He has consistently demonstrated the capacity to manage numerous complex responsibilities concurrently. He is qualified for promotion now and should be selected for attendance at ANCOES at the earliest opportunity. [Indorser's Evaluation of Watkins' performance and potential.]

■ On appeal, a panel of this court reversed the district court's injunction. *Watkins v. United States Army*, 721 F.2d 687, 691 (9th Cir.1983) [hereinafter *Watkins I*]. The panel reasoned that the equity powers of the federal courts could not be exercised to order military officials to violate their own regulations absent a determination that the regulations were repugnant to the Constitution or to the military's statutory authority. *Id.* On remand, the district court held that the Army's regulations were not repugnant to the Constitution or to statutory authority and accordingly denied Watkins' motion for summary judgment and granted summary judgment in favor of the Army. Watkins again appealed and a divided panel of this court reversed the district court's ruling. The panel held that the Army's reenlistment regulations violate the constitutional guarantee of equal protection of the laws because they discriminate against persons of homosexual orientation and because the regulations are not necessary to promote a legitimate compelling governmental interest. *Watkins v. United States Army*, 847 F.2d 1329, 1352–53 (9th Cir.1988) [hereinafter *Watkins II*]. The full court granted review to address the issues raised in *Watkins I*[8] and *Watkins II*. We hold that the Army is estopped from barring Watkins'

---

**8.** The law of the case doctrine does not, as the Army suggests, prevent us from reconsidering the issues raised in *Watkins I. See, e.g., Shimman v. International Union of Operating Engineers, Local 18,* 744 F.2d 1226, 1229 n. 3 (6th Cir.1984) (en banc) ("The law of the case doctrine ... does not impair the power of an en banc court to overrule any panel decision."),

*cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *Van Gemert v. Boeing Co.,* 590 F.2d 433, 436–37 n. 9 (2d Cir.1978) (en banc) (law of the case doctrine cannot immunize panel decisions from review by the court en banc), *aff'd,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *cf. United States v. Mills,* 810 F.2d 907, 909 (9th Cir.1987) (stating that law

reenlistment on the basis of his homosexuality. Accordingly, *Watkins I* no longer states the law of this circuit. Moreover, it is unnecessary to reach the constitutional issues raised in *Watkins II.*

## II. EXHAUSTION OF REMEDIES

■ Before considering Watkins' estoppel claim, we must determine the preliminary question whether Watkins has exhausted available intraservice remedies. Watkins submitted a timely application for reenlistment to his commanding officer, Captain Scott, on July 26, 1982. Following an interview with Watkins, Captain Scott denied his reenlistment request on July 28, 1982 because of Watkins' admitted homosexuality.[9] The Army's position is that Watkins is ineligible for reenlistment due to a nonwaivable disqualification. Any further pursuit of intraservice remedies would therefore be fruitless. *See Watkins,* 551 F.Supp. at 217. As the district court stated, "This court will not require plaintiff to exhaust futile remedies." *Id.* at 218. *See Southeast Alaska Conservation Council, Inc. v. Watson,* 697 F.2d 1305, 1309 (9th Cir.1983) ("Exhaustion of administrative remedies is not required where administrative remedies are inadequate or not efficacious, [or] where pursuit of administrative remedies would be a futile gesture...."). Because we find that Watkins has exhausted all effective intraservice remedies, we now proceed to review the merits of his estoppel claim.

## III. EQUITABLE ESTOPPEL

### A. Reviewability

This circuit and others have noted that not all actions by the military are reviewable in the courts. *See* Note, "Judicial Review of Constitutional Claims Against the Military," 84 Colum.L.Rev. 387, 397–403 (1984). In *Mindes v. Seaman,* 453 F.2d 197, 201 (5th Cir.1971), the Fifth Circuit articulated a test for ascertaining whether a particular internal military decision should be reviewed. *Mindes* cautioned that a court should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations and (b) exhaustion of available intraservice corrective measures. *Id.* If the plaintiff meets both prerequisites, the court must weigh several factors to determine whether to grant review. These factors are (1) the nature and strength of the plaintiff's claim; (2) the potential injury to the plaintiff if review is refused; (3) the extent of interference with military functions; and (4) the extent to which military discretion or expertise is involved. *Id.*

We have adopted in part the *Mindes* test for judicial reviewability of internal military affairs. *See Wallace v. Chappell,* 661 F.2d 729, 733 n. 4 (9th Cir.1981), *rev'd on other grounds,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). In *Wallace,* we applied the *Mindes* factors to constitutional claims, but declined to hold that the *Mindes* factors should be weighed in considering nonconstitutional claims. We stated that "[w]e express no view as to whether the *Mindes* test should govern federal nonconstitutional claims." *Id.* at 733 n. 5.[10] Because in this case the district court

of the case is a discretionary doctrine and declining to apply the doctrine), *cert. denied,* — U.S. —, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987).

**9.** Captain Scott also denied the reenlistment request because of Watkins' alleged refusal to answer questions concerning his homosexuality or homosexual acts. The district court found that this ground for the denial of Watkins' reenlistment request was totally unsupported by the evidence and therefore only reviewed Watkins' admitted homosexuality as a ground for denial of reenlistment. 551 F.Supp. at 217.

**10.** Some of our cases following *Wallace v. Chappell* have used language indicating that an internal military decision is reviewable only when the plaintiff alleges a constitutional, statutory, or regulatory violation. *See Christoffersen v. Washington State Air National Guard,* 855 F.2d 1437, 1442 (9th Cir.1988); *Sandidge v. State of Washington,* 813 F.2d 1025, 1026 (9th Cir.1987); *Sebra v. Neville,* 801 F.2d 1135, 1141 (9th Cir. 1986); *Khalsa v. Weinberger,* 779 F.2d 1393, 1398 (9th Cir.1985), *reaff'd,* 787 F.2d 1288 (9th Cir.1986). Because we hold that the *Mindes* doctrine does not apply to equitable estoppel

found in favor of Watkins on the nonconstitutional ground of equitable estoppel, we are now faced with the question whether the *Mindes* test is applicable to equitable estoppel.

In *Watkins I*, a panel of this court applied the *Mindes* doctrine to hold, in effect, that the only issues that can be reviewed in a suit against the military are claims that the Constitution, a statute, or a regulation has been violated. *See Watkins v. United States Army (Watkins I)*, 721 F.2d 687, 690 (9th Cir.1983). *Watkins I*, which no longer states the law of this circuit, held that our district courts may not use equitable estoppel principles to decide a case on its particular facts when the application of a statute or regulation is challenged as to one individual. Such an extension of the *Mindes* reviewability doctrine to bar equitable relief would improperly require cases against the military to be decided on the broadest possible grounds rather than on the narrowest. In this case, the panel's decision in *Watkins I* caused the district court and the three-judge panel to reach constitutional issues when the case could have been decided narrowly under the doctrine of equitable estoppel.

■■■ Accordingly, we conclude that the *Mindes* doctrine should not be extended to bar equitable estoppel against the military. The special factors that must be found before equitable estoppel can be applied against the government protect the same interests that the *Mindes* test was designed to protect. *See Helm v. State of California*, 722 F.2d 507, 509–10 (9th Cir. 1983) (applying the *Mindes* test to a constitutional claim against the military but not applying it to an assertion of equitable estoppel). The *Mindes* test was created to shield the military from unnecessary disruption. The estoppel doctrine, like the *Mindes* test, addresses the concerns of comity, prudence, and deference. To estop an agency of the government a court must find affirmative misconduct by the government and must also find that the government's conduct will cause a serious injustice and that estoppel will not cause undue harm to the public interest. *Wagner v. Director, Federal Emergency Management Agency*, 847 F.2d 515, 519 (9th Cir. 1988) (quoting *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir.1985)). The stringent requirements that must be satisfied before the government will be estopped safeguard the military from unjustified interference by the courts. Thus where estoppel obtains, there is simply no need to apply the reviewability factors of the *Mindes* test.

The facts of the instant case support this conclusion. To estop the Army from denying Sgt. Watkins reenlistment on the basis of his homosexuality would not disrupt any important military policies or adversely affect internal military affairs. It would simply require the Army to continue to do what it has repeatedly done for fourteen years with only positive results: reenlist a single soldier with an exceptionally outstanding military record.

## B. Equitable Estoppel Against the Government

The Supreme Court has expressly left open the issue whether estoppel may run against the government, refusing to hold "that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). It is well settled, however, that the government may not be estopped on the same terms as a private litigant. *Id.* at 60, 104 S.Ct. at 2224.

Our court has held that " 'where justice and fair play require it,' estoppel will be applied against the government...." *Johnson v. Williford*, 682 F.2d 868, 871 (9th Cir.1982) (quoting *United States v. Lazy FC Ranch*, 481 F.2d 985, 988–89 (9th

against the military, *see infra*, its limitations on reviewability are not relevant here.

Cir.1973)).[11] Our cases indicate that the principles allowing estoppel against the government also apply to the military when justified by the facts. *See, e.g., Helm v. State of California,* 722 F.2d 507 (9th Cir. 1983); *Jablon v. United States,* 657 F.2d 1064 (9th Cir.1981); *Lavin v. Marsh,* 644 F.2d 1378 (9th Cir.1981). Before the government will be estopped, however, two additional elements must be satisfied beyond those required for traditional estoppel.[12] First, "[a] party seeking to raise estoppel against the government must establish 'affirmative misconduct going beyond mere negligence'; even then, 'estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability.' " *Wagner v. Director, Federal Emergency Management Agency,* 847 F.2d 515, 519 (9th Cir.1988) (quoting *Morgan v. Heckler,* 779 F.2d 544, 545 (9th Cir.1985)).[13] In the instant case, we must first determine whether the two threshold requirements for estopping the government are satisfied before deciding whether the traditional elements of estoppel are present.

### 1. Affirmative Misconduct

■ There is no single test for detecting the presence of affirmative misconduct; each case must be decided on its own particular facts and circumstances. *Lavin v. Marsh,* 644 F.2d at 1382–83 n. 6. Affirmative misconduct does require an affirmative misrepresentation or affirmative concealment of a material fact by the government,

*United States v. Ruby Co.,* 588 F.2d 697, 703–04 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), although it does not require that the government intend to mislead a party. *Jablon v. United States,* 657 F.2d at 1067 n. 5. Finally, it is well settled that the government is not bound by the *unauthorized* acts of its agents. *Saulque v. United States,* 663 F.2d at 976 (citing *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917)); *see also Federal Crop Insurance Co. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

■ Here, the Army affirmatively misrepresented in its official records throughout Watkins' fourteen-year military career that he was qualified for reenlistment. On the one occasion when the record was unclear, Watkins sought clarification and his classification was immediately changed from "unknown" to "eligible for reentry on active duty." During this entire fourteen-year period, the Army's policy was that homosexuality constituted a nonwaivable disqualification for reenlistment. The Army has acknowledged, both in its brief in *Watkins II* and at oral argument before the en banc panel, that "[t]he 1981 regulations now in effect [AR 601–280, ¶ 2–21], which expressly bar enlistment or reenlistment of homosexuals, are regarded as a clarification, and not a change, of Army policy." Army's Brief in *Watkins I* at 6.[14] Thus, the Army affirmatively acted in violation of its own regulations when it repeatedly represented that Watkins was eli-

---

**11.** " '[N]o fewer than eight circuits ... have stated that there are some circumstances in which the Government will be estopped....' " *Johnson,* 682 F.2d at 871 (citations omitted).

**12.** *See infra* section III(C) (discussing traditional estoppel).

**13.** In *Johnson,* 682 F.2d at 871, we stated that estoppel may run against the government even when the government acts in its sovereign, as opposed to its proprietary, capacity if the effects of estoppel do not unduly damage the public interest. In *Johnson,* we further noted that in *Saulque v. United States,* 663 F.2d 968, 976 (9th Cir.1981), we made the flat statement in dicta that the government may not be estopped when acting in its sovereign capacity. *Id.* at 871 n. 1. We explained in *Johnson* that the facts of *Sa-*

*ulque* had not required an examination of the applicability of the exception spelled out in *Lazy FC Ranch. Id.* Thus *Saulque* does not preclude application of estoppel against the government when it is acting in its sovereign capacity.

**14.** The earlier opinions in this case discuss the 1981 reenlistment regulations as a policy change. *See, e.g., Watkins I,* 721 F.2d at 689–90. The change, however, went to discharge policy and not to enlistment policy. After 1981, Army boards reviewing discharge cases could no longer make exceptions to the policy against retention of homosexuals. The policy against enlistment or reenlistment of homosexuals never provided for any exceptions.

gible to reenlist, as well as when it reenlisted him time after time.

This case is readily distinguishable from *Lavin v. Marsh*, 644 F.2d 1378 (9th Cir. 1981), where we refused to estop the Army from denying an Army Reserve officer's entitlement to pension benefits. In *Lavin*, the court found that while the Army had failed to determine Lavin's pension eligibility status or to counteract any misunderstanding resulting from recruiters' representations that benefits would be available to Lavin, this conduct did not amount to a "pervasive pattern of false promises" for which the government could be estopped. *Id.* at 1383. The court reasoned that although the Army's conduct was perhaps negligent, the "mere failure to inform or assist does not justify application of equitable estoppel." *Id.* at 1384 (citing *INS v. Hibi*, 414 U.S. 5, 8–9, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973)). In addition, we stated that persons dealing with the government assume the risk that government agents may exceed their authority and provide misinformation, and observed that "Lavin chose trust over caution and he never attempted to confirm his eligibility." *Id.* at 1383.

In the present case, the Army's conduct went far beyond a mere failure to inform or assist. As the district court noted, the Army did not stand aside while Watkins reenlisted or accepted a promotion; it plainly acted affirmatively in admitting, reclassifying, reenlisting, retaining, and promoting Watkins. 551 F.Supp. at 221. Furthermore, this case does not merely involve misinformation provided by government agents. Rather, it involves ongoing active misrepresentations by Army officials acting well within their scope of authority. "Without Army approval [Watkins] would not have been able to enter, remain or progress in the Army. The defendants point out that reenlistment is exclusively the Secretary's function, Here he exercised his authority three times.... To satisfy the element of affirmative misconduct the court need look no further." *Id.*[15]

### 2. Weighing the Injustice to Watkins against the Possibility of Damage to the Public Interest

■ Even when affirmative misconduct has been shown, the government cannot be estopped unless its acts also threaten to work a serious injustice and the public's interest will not be unduly damaged by the imposition of estoppel. *Johnson*, 682 F.2d at 871. This requirement involves a balancing of interests in individual cases. *See* Note, *Equitable Estoppel of the Government*, 79 Colum.L.Rev. 551, 551 (1979); *see also, e.g., Johnson*, 682 F.2d at 871–72 (where a prisoner was erroneously paroled, his subsequent successful reintegration into the community showed that his continuation on parole release did not seriously threaten the public interest. Furthermore, the frustration of the prisoner's expectation to continue, during good behavior, on parole release would be a serious injustice); *Gestuvo v. District Director of INS*, 337 F.Supp. 1093, 1102 (C.D.Cal.1971) (estopping INS from refusing to revalidate approval of an immigrant's third preference classification partly because "[a]ny disruption of the nation's immigration policies that might result from the admission of this single individual into the country would, in short, be miniscule in comparison

---

**15.** In the district court, Watkins presented unrebutted evidence that a forged entry had been made on his Reenlistment Data Card. The entry was falsified so that it appeared to have been made on July 29, 1981 at a reenlistment interview with Captain Rodger L. Scott, Watkins' immediate commanding officer. The forged entry indicated that Watkins was not eligible for reenlistment due to his homosexuality. The entry stated that Watkins was "pending discharge." Watkins provided unrebutted testimony that this alleged interview never occurred and that an earlier entry, in the handwriting of Captain Scott, had been erased. The erased entry was still legible and showed that the Army had earlier found Watkins to be eligible for reenlistment. Watkins' testimony was corroborated by an unrebutted affidavit from a Sgt. Michael Austin. The original entry provides additional evidence of the Army's affirmative misconduct in continuing to find Watkins eligible for reenlistment despite the Army's awareness of his homosexuality. The erasure and the forged entry provide circumstantial evidence of a consciousness of misconduct on the part of the Army and an attempt to conceal that misconduct from exposure.

to the hardship to which he would be subjected by a failure to estop the Service").

▆▆▆ The record in the instant case shows that Sgt. Watkins has greatly benefitted the Army, and therefore the country, by his military service. Even the Army's most recent written evaluation of Watkins, completed during the course of this legal action, contains nothing but the highest praise, describing Watkins' duty performance as "outstanding in every regard" and his potential as "unlimited." In addition, Watkin's homosexuality clearly has not hurt the Army in any way. In the words of an Army review board, "there is no evidence suggesting that [Watkins'] behavior has had either a degrading effect upon unit performance, morale or discipline, or upon his own job performance." As the district court aptly concluded:

> The injury to plaintiff from having relied on the Army's approval of his military career—and being denied it now—is the loss of his career. The harm to the public interest if reenlistment is not prevented is nonexistent. Plaintiff has demonstrated that he is an excellent soldier. His contribution to this Nation's security is of obvious benefit to the public. Furthermore, when the government deals "carefully, honestly and fairly with its citizens," the public interest is likewise benefited.

551 F.Supp. at 223 (citation omitted).

**C. Traditional Elements of Estoppel**

▆▆▆ Having concluded that this is a case in which estoppel may be asserted against the government, we must now decide whether the traditional elements of estoppel are present. Traditional estoppel requires the following:

> (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*United States v. Wharton,* 514 F.2d 406, 412 (9th Cir.1975) (quoting *United States v.* *Georgia–Pacific Corp.,* 421 F.2d 92, 96 (9th Cir.1970)). We adopt district judge Rothstein's thorough analysis of this question as follows.

1. Did the Army know the facts?

The district court recited the following as evidence that the Army knew about Watkins' homosexuality throughout his entire military career.

At his preinduction physical examination in August 1967 plaintiff checked the box on his medical history chart indicating that he had homosexual tendencies. The examining psychiatrist apparently did not believe plaintiff and designated plaintiff as qualified for admission. In November 1968 plaintiff admitted his homosexuality to an Army Criminal Investigation Division agent. Plaintiff was honorably discharged in May 1970 and his reenlistment code was listed as "unknown." Plaintiff requested correction of that code. The Army reclassified plaintiff as eligible for reentry on active duty, and in June 1971 plaintiff reenlisted for three years. In January 1972 plaintiff was denied a security clearance based on his 1968 admission of homosexuality. After another honorable discharge, in March 1974 plaintiff reenlisted for a six year term. In 1975 plaintiff's commander initiated discharge proceedings against plaintiff for unsuitability due to homosexuality. A four member board composed of a Major, two Captains and a First Lieutenant heard testimony establishing that plaintiff was homosexual. Plaintiff's commander, Captain Albert J. Bast III testified that plaintiff, who had told Bast he was homosexual, was "the best clerk I have known." First Sergeant Owen Johnson testified that everyone in the company knew plaintiff was homosexual and that plaintiff's homosexuality had not caused any problems. As noted earlier, the board recommended retention. In November 1977 plaintiff was granted a security clearance for information classified as "Secret." Plaintiff then applied for a position in the Nuclear Surety Personnel Reliability Program. Plaintiff was ini-

tially rejected because his medical records reflected his homosexuality. Plaintiff appealed. His commanding officer, Captain Dale E. [Pastain], wrote in support of plaintiff's appeal, requesting that plaintiff be requalified notwithstanding plaintiff's record. An examining physician concluded that plaintiff's homosexuality caused no problems in his work. The Army requalified plaintiff for admission into the Program in July 1978. In October 1979 plaintiff reenlisted for three years.

551 F.Supp. at 220. Based on these undisputed facts, the district court stated that the Army's position that Army personnel responsible for Watkins' enlistment and reenlistments did not know that he was homosexual was "patently absurd." *Id.* "For the Army to acknowledge that it is aware of plaintiff's homosexuality when it comes to conducting criminal investigations, holding discharge proceedings, and revoking security clearances, but maintain that it is ignorant when four enlistments are at issue, suggests bad faith." *Id.* The district court concluded that the Deputy Chief of Staff for Personnel, who is primarily responsible for Army reenlistment, cannot be deemed to be unaware of the contents of Watkins' personnel file. *Id.*

2. Did the Army Intend that Watkins Act in Reliance on its Conduct, or Did the Army Act so that Watkins Had a Right to Believe the Army so Intended?

The district court found that this element of estoppel was satisfied because, regardless of what the Army actually intended, Watkins had a right to believe the Army intended him to rely on its acts. 551 F.Supp. at 221–22. The district court rejected the Army's contention that Watkins had assumed the risk that his Army career would be discontinued at any time because of his homosexuality. *Id.* at 222. In light of Watkins' candor from the beginning

about his homosexuality and the Army's ongoing acts in violation of its regulations,[16] the district court found that "[t]aken together, over a career spanning more than 14 years, those acts amounted almost to a policy of ignoring this servicemember's homosexuality. As a matter of law, the court concludes that the second element of plaintiff's estoppel claim has been satisfied." *Id.*[17] *See also Johnson,* 682 F.2d at 872 (prisoner had right to believe, after his parole computation erroneously had passed successfully through eight administrative reviews, culminating in his ultimate release on parole for fifteen months, that he would remain on parole during good behavior).

### 3. Was Watkins Ignorant of the True Facts?

The district court stated that the "true fact" here is that homosexuality is a nonwaivable disqualification for reenlistment to which the Army cannot grant exceptions. 551 F.Supp. at 222. The Army's repeated waiver of this disqualification makes it impossible for us to charge Watkins with the knowledge that the disqualification was in fact nonwaivable. *Id. See Johnson,* 682 F.2d at 872 (government's active misadvice to prisoner regarding his eligibility for parole prevented court from charging prisoner with even constructive knowledge of proper meaning of statute in question).

### 4. Did Watkins Rely to his Injury on the Army's Conduct Concerning his Homosexuality?

Regarding this fourth element, the district court stated:

Tied up in litigation, less than six years from retirement, having invested a total of more than 14 years in the Army, it is not difficult to see that plaintiff has relied to his injury on the many "green

16. As the district court noted, the decisions to enlist, to reenlist, to retain, and to promote a soldier are serious and well-considered decisions by the military. *Id.*

17. We emphasize that Watkins' claim is not based on any alleged right, contractual or other-

wise, to reenlist in the Army. There is no such right. Rather, he argues that the Army's misconduct requires that the Army be estopped from denying his eligibility for reenlistment on the basis of his homosexuality.

lights" he received from Army representatives. Plaintiff developed skills necessary for military employment and refrained from developing skills suitable for civilian jobs. He worked more than 14 years toward a retirement benefit that he could have sought elsewhere. Had the Army refused plaintiff reenlistment in the past, plaintiff would not have lost the opportunity for civilian employment that would have brought him to a point of equivalent achievement.

551 F.Supp. at 223. We agree with District Judge Rothstein that the four elements of traditional estoppel are present in this case.

## IV. CONCLUSION

This is a case where equity cries out and demands that the Army be estopped from refusing to reenlist Watkins on the basis of his homosexuality. We therefore reinstate the district court's October 5, 1982 Order estopping the Army from relying on its reenlistment regulation, AR 601–280 ¶ 2–24(c), as a bar to Sgt. Watkins' reenlistment. See 551 F.Supp. at 223.[18]

Our opinions in Watkins I and Watkins II are withdrawn. The district court Order of June 17, 1985 is vacated and the district court Order of October 5, 1982 is AFFIRMED.

NORRIS, Circuit Judge, concurring in the judgment:

### I

I concur in the judgment requiring the Army to reconsider Sgt. Watkins' reenlistment application without regard to his homosexuality. I cannot join the majority's opinion, however, because I agree with the dissent that the judgment cannot rest on the doctrine of equitable estoppel. The Supreme Court has declined to approve the invocation of equitable estoppel against the government even in cases where the facts are no less sympathetic than the facts in Sgt. Watkins' case. See, e.g., INS v. Miranda, 459 U.S. 14, 17–19, 103 S.Ct. 281, 282–84, 74 L.Ed.2d 12 (1982) (per curiam) (reversing Ninth Circuit decision equitably estopping INS from denying resident status to alien spouse of citizen when petitioner became ineligible during INS delay in processing application); INS v. Hibi, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam) (reversing Ninth Circuit decision equitably estopping INS from denying citizenship to Filipino war veteran); Montana v. Kennedy, 366 U.S. 308, 314–15, 81 S.Ct. 1336, 1340–41, 6 L.Ed.2d 313 (1961) (government not estopped to deny citizenship to child of U.S. citizen born while his mother was living abroad, even though government official advised her that she could not return to the U.S. to have her baby). Indeed, the Supreme Court has expressed uncertainty as to whether equitable estoppel can ever be invoked against the government. See Heckler v. Community Health Servs., 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). In any event, I see no justification for invoking the doctrine on the facts of this case.

In my view, Watkins is entitled to relief because the Army denied him the equal protection of the laws by discharging and refusing to reenlist him solely on the basis of his homosexuality. Before addressing Watkins' claim that the Army's regulations

---

**18.** Our holding does not mean and should not be read to imply that Watkins has a right to commit acts that Congress has declared illegal. See Watkins, 551 F.Supp. at 225. We do nevertheless reiterate the point made in the district court's October 28, 1982 Order "that the Army cannot, consistent with the [district] court's October 5 Order, use plaintiff's homosexuality as an open door through which to probe for possible misconduct, when it has no grounds to believe such misconduct exists." 551 F.Supp. at 225.

In addition, we note that the district court found that the Army's attempt to discharge Watkins in 1982 was barred by the Army's regulation against double jeopardy, AR 635–200, ¶ 1–19(b)(2), because the 1982 discharge proceedings essentially repeated the 1975 discharge proceedings against Watkins. 541 F.Supp. at 257–58. The Army did not appeal from that judgment. Therefore, the Army may not attempt to discharge Watkins for any alleged homosexual acts that were the subject of past discharge proceedings or for any past or future statements by Watkins acknowledging his homosexuality.

on homosexuality violate equal protection, however, I must address Watkins' non-constitutional claim—that the Army's discharge and reenlistment regulations are arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).[1] I reject this claim because Watkins does not argue that the Army's regulations on homosexuality themselves violate the Administrative Procedure Act; rather he argues only that the regulations are arbitrary as applied to the facts of his case. Because he does not argue that the regulations on their face are arbitrary or capricious, Watkins' APA claim must fail. *See Watkins I*, 721 F.2d at 690–91.

I now turn to Watkins' claim that the Army's regulations deny him equal protection of the laws in violation of the Fifth Amendment.[2] Watkins argues that the Army's regulations constitute an invidious discrimination based on sexual orientation.[3] To evaluate this claim I must engage in a three-stage inquiry. First, I must decide whether the regulations in fact discriminate on the basis of sexual orientation. Second, I must decide which level of judicial scrutiny applies by asking whether discrimination based on sexual orientation burdens a suspect or quasi-suspect class,[4]

which would make it subject, respectively, to strict or intermediate scrutiny. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439–41, 105 S.Ct. 3249, 3253–55, 87 L.Ed.2d 313 (1985). If the discrimination burdens no such class, it is subject to ordinary rationality review. *Id.* Finally, I must decide whether the challenged regulations survive the applicable level of scrutiny by deciding whether, under strict scrutiny, the legal classification is necessary to serve a compelling governmental interest; whether, under intermediate scrutiny, the classification is substantially related to an important governmental interest; or whether, under rationality review, the classification is rationally related to a legitimate governmental interest. *See id.*

II

I turn first to the threshold question raised by Watkins' equal protection claim: Do the Army's regulations discriminate on the basis of sexual orientation? The portion of the Army's reenlistment regulation that bars homosexuals from reenlisting states in full:

Applicants to whom the disqualifications below apply are ineligible for RA [Regular Army] reenlistment at any time and

---

1. Because I would grant Watkins the relief he seeks on the basis of his equal protection claim, I need not address in this concurring opinion Watkins' other constitutional claims involving the free speech clause, the petition clause, and the due process entrapment doctrine.

2. The equal protection component of the Fifth Amendment imposes precisely the same constitutional requirements on the federal government as the equal protection clause of the Fourteenth Amendment imposes on state governments. *See, e.g., Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975).

3. In this opinion I use the term "sexual orientation" to refer to the orientation of an individual's sexual preference, not to his actual sexual conduct. Individuals whose sexual orientation creates in them a desire for sexual relationships with persons of the opposite sex have a heterosexual orientation. Individuals whose sexual orientation creates in them a desire for sexual relationships with persons of the same sex have a homosexual orientation.

In contrast, I use the terms "homosexual conduct" and "homosexual acts" to refer to sexual

activity between two members of the same sex whether their orientations are homosexual, heterosexual, or bisexual, and we use the terms "heterosexual conduct" and "heterosexual acts" to refer to sexual activity between two members of the opposite sex whether their orientations are homosexual, heterosexual, or bisexual.

Throughout this opinion, the terms "gay" and "homosexual" will be used synonymously to denote persons of homosexual orientation.

4. Discriminations that burden some despised or politically powerless groups are so likely to reflect antipathy against those groups that the classifications are inherently suspect and must be strictly scrutinized. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982). Such groups are generally termed "suspect classes." The Supreme Court has identified other groups whose history of past discrimination entitles them to intermediate scrutiny protection under equal protection doctrine. Such groups are termed "quasi-suspect" classes. *See generally*, Nowak, Rotunda & Young, *Constitutional Law*, Ch. 16, § 1, at 593 (2d ed. 1983).

requests for waiver or exception to policy will not be submitted....

c. Persons of questionable moral character and a history of antisocial behavior, sexual perversion or homosexuality. A person who has committed homosexual acts or is an admitted homosexual but as to whom there is no evidence that they have engaged in homosexual acts either before or during military services is included. (See note 1)....

k. Persons being discharged under AR 635–200 for homosexuality....

*Note:* Homosexual acts consist of bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual satisfaction, or any proposal, solicitation, or attempt to perform such an act. Persons who have been involved in homosexual acts in an apparently isolated episode, stemming solely from immaturity, curiousity [sic], or intoxication, and in the absence of other evidence that the person is a homosexual, normally will not be excluded from reenlistment. A homosexual is a person, regardless of sex, who desires bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent to obtain or give sexual gratification. Any official, private, or public profession of homosexuality, may be considered in determining whether a person is an admitted homosexual.

AR 601–280, ¶ 2–21. Although worded in somewhat greater detail, the Army's regulation mandating the separation of homosexual soldiers from service (discharge), AR 635–200, is essentially the same in substance.[5]

5. AR 635–200 provides:

15–2 Definitions ...

a. Homosexual means a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts.

b. Bisexual means a person who engages in, desires to engage in, or intends to engage in homosexual and heterosexual acts.

c. A homosexual act means bodily contact, actively undertaken or passively permitted, between soldiers of the same sex for sexual satisfaction.

15–3 Criteria

The basis for separation may include preservice, prior service, or current service conduct or statements. A soldier will be separated per this chapter if one or more of the following approved findings is made:

a. The soldier has engaged in, attempted to engage in, or solicited another to engage in a homosexual act unless there are further approved findings that—

(1) Such conduct is a departure from the soldier's usual and customary behavior; and

(2) Such conduct is unlikely to recur because it is shown, for example, that the act occurred because of immaturity, intoxication, coercion, or a desire to avoid military service; and

(3) Such conduct was not accomplished by use of force, coercion, or intimidation by the soldier during a period of military service; and

(4) Under the particular circumstances of the case, the soldier's continued presence in the Army is consistent with the interest of the Army in proper discipline, good order, and morale; and

(5) The soldier does not desire to engage in or intend to engage in homosexual acts.

*Note:* To warrant retention of a soldier after finding that he or she engaged in, attempted to engage in, or solicited another to engage in a homosexual act, the board's findings must specifically include all *five* findings listed in a(1) through (5) above. In making these additional findings, boards should reasonably consider the evidence presented. For example, engagement in homosexual acts over a long period of time could hardly be considered "a departure from the soldier's usual and customary behavior." The intent of this policy is to permit retention *only* of *nonhomosexual* soldiers who, because of extenuating circumstances (as demonstrated by findings required by para 15–3a(1) through (5)) engaged in, attempted to engage in, or solicited a homosexual act.

b. The soldier has stated that he or she is a homosexual or bisexual, unless there is a further finding that the soldier is not a homosexual or bisexual.

c. The soldier has married or attempted to marry a person known to be of the same biological sex (as evidenced by the external anatomy of the person involved) unless there are further findings that the soldier is not a homosexual or bisexual (such as, where the purpose of the marriage or attempt to marry was the avoidance or termination of military service).

AR 635–200, ¶¶ 15–2 & 15–3 (emphasis in original).

Although it is the Army's refusal to reenlist Watkins because of his homosexuality that is directly at issue, Watkins' challenge to the Army's regulation on discharge is relevant to this appeal for two reasons: (1) persons being validly discharged for homosexuality at the time

On their face, these regulations discriminate against homosexuals on the basis of their sexual orientation. Under the regulations any homosexual act or statement of homosexuality gives rise to a presumption of homosexual orientation, and anyone who fails to rebut that presumption is conclusively barred from Army service. In other words, the regulations target homosexual orientation itself. The homosexual acts and statements are merely relevant, and rebuttable, indicators of that orientation.

In spite of these facial appearances, the Army argues that its regulations target homosexual conduct rather than orientation. I cannot agree. A close reading of the complex regulations leaves no room for doubt that the regulations target orientation rather than conduct.

Under the Army's regulations, "homosexuality," not sexual conduct, is clearly the operative trait for disqualification. AR 601–280, ¶ 2–21(c); *see also* AR 635–200, ¶ 15–1(a) (articulating the same goal). For example, the regulations ban homosexuals who have done nothing more than acknowledge their homosexual orientation even in the absence of evidence that the persons ever engaged in any form of sexual conduct. The reenlistment regulation disqualifies any "admitted homosexual"—a status that can be proved by "[a]ny official, private, or public profession of homosexuality" even if "there is no evidence that they have engaged in homosexual acts either before or during military service." AR 601–280, ¶ 2–21(c) & note; *see also* AR 635–200, ¶ 15–3(b). Since the regulations define a "homosexual" as "a person, regardless of sex, who *desires* bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent to obtain or give sexual gratification," a person can be deemed homosexual under the regulations without ever engaging in a homosexual act. 601–280, ¶ 2–21(c) & note (emphasis added); *see also* A.R. 635–200, 15–2(a) (same desire sufficient to make one homosexual). Thus, no matter what statements a person has made, and what conduct he or she has engaged in, the ultimate evidentiary issue is whether he or she has a homosexual orientation. Under the reenlistment regulation, persons are disqualified from reenlisting only if, based on any "profession of homosexuality" they have made, they are found to have a homosexual orientation. AR 601–280, ¶ 2–21(c) & note. Similarly, under the discharge regulation a soldier must be discharged if "[t]he soldier has stated that he or she is a homosexual or bisexual, *unless* there is a further finding that the soldier is not a homosexual or bisexual." AR 635–200, ¶ 15–3(b) (emphasis added). In short, the regulations do not penalize all statements of sexual desire, or even only statements of homosexual desire; they penalize only homosexuals who declare their homosexual orientation.

True, a "person who has committed homosexual acts" is also presumptively "included" under the reenlistment regulation as a person excludable for "homosexuality." AR 601–280, ¶ 2–21(c); *see also* AR 635–200, ¶ 15–3(a). But it is clear that this provision is merely designed to round out the possible evidentiary grounds for inferring a homosexual orientation. The regulations define "homosexual acts" to encompass any "bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual satisfaction, or any proposal, solicitation, or attempt to perform such an act." AR 601–280, ¶ 2–21(c) & note; *see also* AR 635–200, ¶¶ 15–2(c) & 15–3(a) (stating the same in slightly different order). Thus, the regulations barring homosexuals from the Army cover any form of bodily contact between persons of the same sex that gives sexual satisfaction—from oral and anal intercourse to holding hands, kissing, caressing and any number of other sexual acts. Indeed, in this case the Army tried to prove at Wat-

of reenlistment, as Watkins was, cannot reenlist under 601–280 ¶ 2–21(k); (2) enjoining the Army to consider Watkins' reenlistment application without regard to his homosexuality will provide no effective relief if he would be subject to mandatory discharge because of homosexuality as soon as he was reenlisted. I thus consider Watkins' challenge to the constitutionality of the Army's discharge regulation as well as its reenlistment regulation.

kins' discharge proceedings that he had committed a homosexual act described as squeezing the knee of a male soldier, but failed to prove it was Watkins who did the alleged knee-squeezing. Moreover, even non-sexual conduct can trigger a presumption of homosexuality: The regulations provide for the discharge of soldiers who have "married or attempted to marry a person known to be of the same sex ... *unless* there are further findings that the soldier is not a homosexual or bisexual." AR 635–200, ¶ 15–3(c) (emphasis added). With all the acts and statements that can serve as presumptive evidence of homosexuality under the regulations, it is hard to think of any grounds for inferring homosexual orientation that are *not* included.[6] The fact remains, however, that homosexual orientation, not homosexual conduct, is plainly the object of the Army's regulations.

Moreover, under the regulations a person is not automatically disqualified from Army service just because he or she committed a homosexual act. Persons may still qualify for the Army despite their homosexual conduct if they prove to the satisfaction of Army officials that their *orientation* is heterosexual rather than homosexual. To illustrate, the discharge regulation provides that a soldier who engages in homosexual acts can escape discharge if he can show that the conduct was "a departure from the soldier's usual and custom-

ary behavior" that "is unlikely to recur because it is shown, for example, that the act occurred because of immaturity, intoxication, coercion, or a desire to avoid military service" *and* that the "soldier does not desire to engage in or intend to engage in homosexual acts." AR 635–200, ¶ 15–3(a). The regulation expressly states, "The intent of this policy is to permit retention *only* of *nonhomosexual* soldiers who, because of extenuating circumstances engaged in, attempted to engage in, or solicited a homosexual act." *Id.* at note (emphasis in original). Similarly, the Army's ban on reenlisting persons who have committed homosexual acts does not apply to "[p]ersons who have been involved in homosexual acts in an apparently isolated episode, stemming solely from immaturity, curiousity [sic], or intoxication, and in the absence of other evidence that the person is a homosexual." AR 601–280, ¶ 2–21 note. If a straight soldier and a gay soldier of the same sex engage in homosexual acts because they are drunk, immature or curious, the straight soldier may remain in the Army while the gay soldier is automatically terminated. In short, the regulations do not penalize soldiers for engaging in homosexual acts; they penalize soldiers who have engaged in homosexual acts only when the Army decides that those soldiers are actually gay.[7]

---

**6.** In stark contrast to the breadth and focus of the regulations, the only statute Congress has enacted regulating the private consensual sexual activity of military personnel covers only sodomy, not other forms of sexual conduct, and covers sodomy whether engaged in by homosexuals or heterosexuals. 10 U.S.C. § 925 (1982) provides:

(a) Any person subject to this chapter who engages in unnatural carnal copulation with another person of the same or opposite sex or with an animal is guilty of sodomy. Penetration, however slight, is sufficient to complete the offense.

(b) Any person found guilty of sodomy shall be punished as a court-martial may direct.

Although the statute does not define "sodomy" or "unnatural carnal copulation," the statute does require proof of "penetration," which apparently limits sodomy to oral and anal copulation. *See United States v. Harris,* 8 M.J. 52, 53–59 (C.M.A.1979).

The Army has never made a finding that Watkins ever engaged in an act of sodomy in violation of section 925. Indeed, the Army twice investigated Watkins for allegedly committing sodomy in violation of section 925 and had to drop both investigations because of "insufficient evidence."

**7.** This reading of the regulations is supported by the Army's treatment of Watkins himself. The only evidence that Watkins ever engaged in homosexual conduct is a statement he made during a 1968 investigation that he committed homosexual acts with two other servicemen. When these two servicemen denied engaging in homosexual acts with Watkins, the Army discontinued the investigation without making a finding that Watkins had committed homosexual acts. The Army did not decide to discharge Watkins (and deny him reenlistment) until 1981. In the meantime, Watkins openly and repeatedly acknowledged his homosexual orientation without admitting to any homosexual acts. It strains credulity to think that the Army

In sum, the discrimination against homosexual orientation under these regulations is about as complete as one could imagine. The regulations make any act or statement that might conceivably indicate a homosexual orientation evidence of homosexuality; that evidence is in turn weighed against any evidence of a heterosexual orientation. It is thus clear in answer to my threshold equal protection inquiry that the regulations directly burden the class consisting of persons of homosexual orientation.

### III

### A

Before reaching the question of the level of scrutiny applicable to discrimination based on sexual orientation and the question whether the Army's regulations survive the applicable level of scrutiny, I first address the Army's argument that *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), forecloses Watkins' equal protection claim. In *Hardwick*, the Court rejected a claim by a homosexual that a Georgia statute criminalizing sodomy deprived him of his liberty without due process of law in violation of the Fourteenth Amendment. More specifically, the Court held that the constitutionally protected right to privacy—recognized in cases such as *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)—does not extend to acts of consensual homosexual

sodomy.[8] *See id.* 478 U.S. at 190–96, 106 S.Ct. at 2843–46. The Court's holding was limited to this due process question. The parties did not argue and the Court explicitly did not decide the question whether the Georgia sodomy statute might violate the equal protection clause. *See id.* at 196, n. 8,[9] 106 S.Ct. at 2846 n. 8.

The Army nonetheless argues that it would be "incongruous" to hold that its regulations deprive gays of equal protection of the laws when *Hardwick* holds that there is no constitutionally protected privacy right to engage in homosexual sodomy. Army's Second Supp. Brief at 19. I could not disagree more. First, while *Hardwick* does indeed hold that the due process clause provides no substantive privacy protection for acts of private homosexual sodomy, nothing in *Hardwick* suggests that the state may penalize gays merely for their sexual orientation. *Cf. Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (holding that state violated due process by criminalizing the status of narcotics addiction, even though the state could criminalize the use of the narcotics—conduct in which narcotics addicts by definition are prone to engage). In other words, the class of persons involved in *Hardwick*—those who engage in homosexual sodomy—is not congruous with the class of persons targeted by the Army's regulations—those with a homosexual orientation. *Hardwick* was a "conduct"

decided to discharge Watkins and deny him reenlistment solely on the basis of his contradicted statement in 1968 that he had committed homosexual acts. Plainly it is Watkins' homosexual orientation—rather than evidence of any conduct—that explains the Army's decision to end Watkins' Army career.

8. Under the Court's analysis, because the Constitution's protection of the right to privacy does not extend to homosexual sodomy, a judgment by the state that sodomy is immoral provides a sufficiently rational basis for sodomy laws to satisfy the requirements of substantive due process. *See Hardwick* at 196, 106 S.Ct. at 2846.

9. *See also Hardwick*, 478 U.S. at 201, 106 S.Ct. at 2849 (Blackmun, J., dissenting) (Court "refused to consider" equal protection clause); *Doe v.*

*Casey*, 796 F.2d 1508, 1522 (D.C.Cir.1986), *aff'd in part, rev'd in part sub. nom, Webster v. Doe*, —— U.S. ——, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) ("Although … the Supreme Court's recent decision in *Bowers v. Hardwick* [held] that homosexual *conduct* is not constitutionally protected, the Court did not reach the different issue of whether an agency of the federal government can discriminate against individuals merely because of sexual *orientation.*" (Footnotes omitted and emphasis in the original.)); *Swift v. United States*, 649 F.Supp. 596, 42 FEP Cases (BNA) 787, 790 (D.D.C.1987) ("this Circuit has declined to read [*Hardwick* ] as barring claims of discrimination based on sexual preference"); *but cf. Padula v. Webster*, 822 F.2d 97 (D.C.Cir.1987) ("reasoning in *Hardwick* forecloses … suspect class status for practicing homosexuals").

case; Watkins' is an "orientation" case.[10]

Second, and more importantly, *Hardwick* does not foreclose Watkins' claim because Hardwick was a *due process*, not an *equal protection* case.[11] Although the Army acknowledges, as it must, that *Hardwick* does not discuss equal protection explicitly, the Army nonetheless argues that *Hardwick's* discussion of due process has equal protection implications. Specifically, the Army argues that the *Hardwick* Court, in holding that the criminalization of homosexual sodomy does not violate due process, decided *sub silentio* that the criminalization of *heterosexual* sodomy *would* violate due process. The Army concludes from this that *Hardwick* is controlling precedent that the government may discriminate against homosexuals without violating equal protection.

Both the premise and the conclusion of the Army's argument are mistaken. In the first place, *Hardwick* did not decide *sub silentio* that heterosexual sodomy is constitutionally protected. Indeed, the Court expressly refused to take a position on whether heterosexual sodomy was protected by the due process clause.[12] Second, even if we accept, *arguendo*, the Army's premise that the *Hardwick* Court drew a distinction between homosexual sodomy and heterosexual sodomy for due process purposes,

such a distinction under the *due process* clause would have no bearing on whether the *equal protection* clause nonetheless prohibits official discrimination against homosexuals. I discuss these points in turn.

Implicit in the Army's position is the proposition that the Court in *Hardwick* somehow *did* decide that the due process clause prohibits a state from criminalizing heterosexual sodomy. That is, the Army reads Justice White's opinion in *Hardwick* as extending the zone of privacy first recognized in *Griswold* to heterosexual sodomy, thus drawing a due process line between heterosexual and homosexual sodomy. That reading of *Hardwick* flies directly in the face of footnote 2, which expressly reserves the question of the constitutionality of the Georgia statute as applied to heterosexual sodomy. *See* 478 U.S. at 188 n. 2, 106 S.Ct. at 2842 n. 2.[13]

Even apart from the Court's express reservation of this question, the Army's reading of *Hardwick* is untenable. I see no basis for reading *Hardwick* as holding *sub silentio* that a right to engage in heterosexual sodomy is "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty"—which would be necessary for heterosexual sodomy to qualify for due process protection

**10.** One commentator and one district court have already agreed with *Watkins II* that the conduct-orientation dichotomy is a valid way of distinguishing Watkins' case from *Hardwick*. As Professor Sunstein has written, "this feature [the conduct/orientation distinction] serves to distinguish [*Watkins* from] *Hardwick* in a persuasive way...." Sunstein, Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection, 55 U.Chi.L.Rev. 1161, 1162 n. 9 (1988).

In *BenShalom v. Secretary of Army,* 703 F.Supp. 1372 (1989), the District Court for the Eastern District of Wisconsin prevented the Army from denying reenlistment to Sergeant BenShalom under the same regulations Watkins challenges. The district court based this decision on both the First Amendment and the equal protection component of the Fifth Amendment. In analyzing BenShalom's equal protection claim, the district court tracked the equal protection analysis of *Watkins II,* relying heavily on the conduct/orientation distinction.

**11.** Thus, whether the Army's regulations are "conduct-based" or "orientation-based," *Hardwick* cannot be read to foreclose Watkins' equal

protection claim. Professor Sunstein agrees, noting that *"Hardwick* ... was interpreted correctly in the majority opinion in *Watkins [II],* and misread in ... Judge Reinhardt's opinion in *Watkins [II]* .... [Because *Hardwick* involved due process rather than equal protection], *Watkins* can be distinguished from *Hardwick* even if the former decision were to be applied to a class of people including some, many or all who engage in the conduct at issue in *Hardwick."* Sunstein, *supra* note 10, at 1162 & n. 9.

**12.** *See Hardwick,* 478 U.S. at 188 n. 2, 106 S.Ct. at 2842 n. 2.

**13.** "The only claim properly before the Court ... is Hardwick's challenge to the Georgia statute as applied to consensual homosexual sodomy. *We express no opinion on the constitutionality of the Georgia statute as applied to other acts of sodomy." Hardwick,* 478 U.S. at 188 n. 2, 106 S.Ct. at 2842 n. 2. (emphasis added).

under *Hardwick*'s analysis.[14] Note that when the Court found the suggestion that homosexual sodomy qualified for due process protection to be "at best, facetious," 478 U.S. at 194, 106 S.Ct. at 2846, it relied upon the historical fact that sodomy was a criminal offense at common law, under the laws of all 13 colonies, and, until 1961, under the laws of all 50 states. 478 U.S. at 192–94, 106 S.Ct. at 2844–46. Note further that the Court did *not* find it significant that these laws, as Justice Stevens pointed out in his dissent, drew no distinction between homosexual and heterosexual sodomy. *See* 478 U.S. at 214–15, 106 S.Ct. at 2856–57.[15] They outlawed all acts of sodomy, both homosexual and heterosexual.

In light of the historical record relied upon by the Court, there is no way to read *Hardwick* as establishing that heterosexual sodomy is "deeply rooted in this Nation's history and tradition" while homosexual sodomy is not. I find it untenable, then, to interpret *Hardwick* as extending due process protection to heterosexual conduct while denying such protection to homosexual conduct. It is hard to imagine that the Court in *Hardwick* intended to suggest that acts of heterosexual sodomy implicate higher constitutional values than acts of homosexual sodomy.

Even if, as the Army implicitly argues, *Hardwick* did in fact extend constitutional protection to heterosexual sodomy while denying it to homosexual sodomy, such a differentiation between heterosexual and homosexual sodomy for *due process* purposes would have no bearing—none—on the entirely separate question whether official discrimination against homosexuals violates the *equal protection* clause. The relevant inquiry in equal protection jurisprudence is fundamentally different from the relevant due process inquiry. The due process clause, as the Court recognized in

*Hardwick*, protects practices which are "deeply rooted in this Nation's history and tradition." The equal protection clause, in contrast, protects minorities from discriminatory treatment at the hands of the majority. Its purpose is not to protect traditional values and practices, but to *call into question* such values and practices when they operate to burden disadvantaged minorities. As Professor Sunstein puts it:

> From its inception, the Due Process Clause has been interpreted largely (though not exclusively) to protect traditional practices against short-run departures. The clause has therefore been associated with a particular conception of judicial review, one that sees the courts as safeguards against novel developments brought about by temporary majorities who are insufficiently sensitive to the claims of history.
>
> The Equal Protection Clause, by contrast, has been understood as an attempt to protect disadvantaged groups from discriminatory practices, however deeply engrained and longstanding. The Due Process Clause often looks backward; it is highly relevant to the Due Process issue whether an existing or time-honored convention, described at the appropriate level of generality, is violated by the practice under attack. By contrast, the Equal Protection Clause looks forward, serving to invalidate practices that were widespread at the time of its ratification and that were expected to endure. The two clauses therefore operate along different tracks.

Sunstein, *supra* note 10, at 1163.

The Supreme Court did not decide in *Hardwick*—and indeed has never decided in any case—whether discrimination against homosexuals violates equal protection. All *Hardwick* decided is that homo-

---

**14.** *See Hardwick,* 478 U.S. at 191–92, 106 S.Ct. at 2844 (*quoting Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) and *Moore v. East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (Opinion of Powell, J.)).

**15.** *See also* Anne Goldstein, History, Homosexuality, and Political Values: Searching for the

Hidden Determinants of *Bowers v. Hardwick* 97 Yale L.J. 1073, 1084–85 (1988) (state laws relied upon by majority outlawed all sodomy, whether homosexual or heterosexual). Moreover, Congress has not distinguished between heterosexual and homosexual sodomy in proscribing acts of sodomy by members of the armed forces. *See supra* note 6.

sexual sodomy is not a practice so "deeply rooted in this Nation's history and tradition" that it falls within the zone of personal privacy protected by the due process clause. It is perfectly consistent to say that homosexual sodomy is not a practice so deeply rooted in our traditions as to merit due process protection, and at the same time to say, for example, that because homosexuals have historically been subject to invidious discrimination, laws which burden homosexuals as a class should be subjected to heightened scrutiny under the equal protection clause. Indeed, the two propositions may be complementary: In all probability, homosexuality is not considered a deeply-rooted part of our traditions *precisely because* homosexuals have historically been subjected to invidious discrimination. In any case, homosexuals do not become "fair game" for discrimination simply because their sexual practices are not considered part of our mainstream traditions.

A hypothetical may help make the point. Suppose a city passed a "single family occupancy" housing ordinance allowing only members of the immediate, nuclear family to live in the same house.[16] Suppose further that a disproportionate number of black families in the community lived together in extended families that included, for example, cousins and grandparents.[17] Finally, suppose the ordinance was motivated by a racially discriminatory purpose.[18] A black family challenging the ordinance could raise a due process claim, arguing that the ordinance impermissibly intruded on "deeply rooted" family traditions. In real life, the Court found such a due process claim persuasive.[19] But suppose the Court had rejected the due process claim. Suppose the Court had instead agreed with the city of East Cleveland that the privacy interests protected by the Constitution do not include extended family relationships— that the due process clause does not "give grandmothers any fundamental rights with respect to grandsons."[20] In that event, the black family could still challenge the ordinance on equal protection grounds, arguing that the ordinance discriminated against blacks. Could anyone seriously maintain that the Court's hypothetical refusal to give *due process* protection to "extended family" living would have any bearing on the black family's *equal protection* claim? Of course not. And the black family's equal protection claim would be no less viable even if the Court in the hypothetical had ruled that due process *does* protect the nuclear family (in the hypothetical, the form disproportionately favored by the whites in the community) but *does not* protect the extended family (disproportionately favored by blacks).

The relationship between *Hardwick* and Watkins' case is exactly the same as the relationship between the due process and equal protection claims in this hypothetical. Whether homosexual conduct is protected by the due process clause is an entirely separate question from whether the equal protection clause prohibits discrimination against homosexuals. And in answering this latter question, it makes no difference whether the *Hardwick* Court intended to extend *due process* protection to heterosexual conduct, but not homosexual conduct. In sum, the equal protection question presented by Sgt. Watkins simply is not answered—not in the slightest—by *Hardwick.*

The Army also argues that *Hardwick*'s concern "about the limits of the Court's role in carrying out its constitutional mandate," 478 U.S. at 190, 106 S.Ct. at 2843, should prevent courts from holding that equal protection doctrine protects homosexuals from discrimination. To be sure, the

---

**16.** This example is loosely drawn from *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

**17.** *See Moore,* 431 U.S. at 509, 97 S.Ct. at 1940 (Brennan, J., concurring) (indicating this was the case in East Cleveland).

**18.** I should make clear that this was not shown to be the case in *Moore. See* 431 U.S. at 510, 97 S.Ct. at 1941 (Brennan, J., concurring).

**19.** *See Moore,* 431 U.S. at 505–06, 97 S.Ct. at 1938–39 (plurality opinion).

**20.** *See* 431 U.S. at 500, 97 S.Ct. at 1936 (plurality opinion) (quoting city's argument).

Court in *Hardwick* justified its decision to cabin the right to privacy largely by pointing to the problems allegedly created when judges recognize constitutional "rights not readily identifiable in the Constitution's text" and "having little or no cognizable roots in the language or design of the Constitution." 478 U.S. at 191, 194, 106 S.Ct. at 2844, 2846. The Court stressed its concern that such rights might be perceived as involving "the imposition of the Justices' own choice of values on the States and the Federal Government" and that this antidemocratic perception might undermine the legitimacy of the Court. *Id.* Finally, the Court expressed the more specific concern about potential difficulties in defining the contours of the right to privacy. *See id.* at 195–96, 106 S.Ct. at 2846–47.

Whatever one might think about the *Hardwick* Court's concerns about substantive due process in general and the right of privacy in particular, these concerns have little if any relevance to equal protection doctrine.[21] The right to equal protection of the laws has a clear basis in the text of the Constitution. This principle of equal treatment, when imposed against majoritarian rule, arises from the Constitution itself, not from judicial fiat. Moreover, equal protection doctrine does not prevent the majority from enacting laws based on its substantive value choices. Equal protection simply requires that the majority apply its values evenhandedly. Indeed, equal protection doctrine plays an important role in perfecting, rather than frustrating, the democratic process. The constitutional requirement of evenhandedness advances the political legitimacy of majority rule by safeguarding minorities from majoritarian oppression. The requirement of evenhandedness also facilitates a representation of minorities in government that advances the operation of representative democracy.[22] Finally, the practical difficulties of defining the requirements imposed by equal protection, while not insignificant, do not involve the judiciary in the same degree of value-based line-drawing that the Supreme Court in *Hardwick* found so troublesome in defining the contours of substantive due process. In sum, the driving force behind *Hardwick* is the Court's ongoing concern with the expansion of rights under substantive due process, not an unbounded antipathy toward a disfavored group.

B

The Army also relies upon *Beller v. Middendorf,* 632 F.2d 788 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981), *Hatheway v. Secretary of the Army,* 641 F.2d 1376 (9th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981), and *DeSantis v. Pacific Tel. & Tel. Co.,* 608 F.2d 327 (9th Cir.1979), to argue that the Ninth Circuit has already rejected the kind of equal protection attack Watkins makes. In my view, the equal protection question Watkins raises—whether the Army's regulations should be subjected to strict scrutiny because homosexuals constitute a suspect class—was not addressed in any of these Ninth Circuit cases.

The Army's reliance on *Beller* is misplaced because *Beller,* like *Hardwick,* is a substantive due process case, not an equal protection case. In rejecting a substantive due process challenge to Navy regulations providing for the discharge of personnel who engaged in homosexual acts, our court held in *Beller* that substantive due process

---

**21.** Professor John Hart Ely, for example, has severely criticized the Supreme Court's substantive due process analysis in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), while at the same time expressing the view that governmental classifications burdening homosexuals merit heightened scrutiny under the equal protection clause. *Compare* J. Ely, Democracy and Distrust 248 n. 52 (1980), *with id.* at 162–64.

**22.** *See generally* J. Ely, *supra* note 21, at 101–02 ("unlike an approach geared to the judicial im-

position of 'fundamental values,' the representation-reinforcing [approach] ... is not inconsistent with, but to the contrary is entirely supportive of, the American system of representative democracy. It recognizes the unacceptability of the claim that appointed and life-tenured judges are better reflectors of conventional values than elected representatives, devoting itself instead to policing the mechanisms by which the system seeks to ensure that our elected representatives will actually represent.").

required only that courts balance the governmental and individual interests at stake in a fashion similar to intermediate scrutiny. *Beller*, 632 F.2d at 805–12. As now-Justice Kennedy's carefully tailored opinion makes clear, *Beller's* appeal did "not require us to address the question whether consensual private homosexual conduct is a fundamental right as that term is used in equal protection ... [and was] not presented to us as implicating a suspect or quasi-suspect classification.... Substantive due process, not equal protection, was the basis of the constitutional claim, and we address the case in those terms." *Id.* at 807. Thus, *Beller*, like *Hardwick*, has no relevance to Watkins' claim that the challenged governmental regulations discriminate against a suspect class in violation of equal protection doctrine. *See Sethy v. Alameda County Water Dist.*, 545 F.2d 1157, 1159–60 (9th Cir.1976) (en banc) (a prior decision is not precedent on issues that were neither raised by counsel nor discussed in the opinion of the court); *Sakamoto v. Duty Free Shoppers*, 764 F.2d 1285, 1288 (9th Cir. 1985) (same).

The Army's reliance on *Hathaway v. Secretary of the Army*, 641 F.2d 1376 (9th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981), is also misplaced. In *Beller*, our court reserved two distinct equal protection questions: first, whether the challenged regulations penalizing homosexual conduct burdened the exercise of a fundamental or important substantive right to engage in certain conduct; second, whether the challenged regulations discriminated against a suspect or quasi-suspect class. As explained below, in *Hatheway* we clearly answered the first of these discrete equal protection questions. The Army argues, however, that *Hatheway* also decided the second question reserved in *Beller*—the question raised in Watkins' claim—whether homosexuals constitute a suspect or quasi-suspect class.[23]

Hatheway, a soldier convicted of committing sodomy in violation of 10 U.S.C. § 925, claimed that the Army was prosecuting cases involving homosexual sodomy while refusing to prosecute cases involving heterosexual sodomy. Our court "understood Hatheway's claim (that the commission of a homosexual act is an impermissible basis for prosecution) to be an equal protection argument," *Hatheway*, 641 F.2d at 1382, which we treated as resting on the branch of equal protection doctrine concerned with whether a governmental classification burdens a fundamental or important substantive right to engage in certain conduct. Thus, we explicitly characterized Hatheway's claim "that the commission of a homosexual act is an impermissible basis for prosecution" to be the sort of equal protection claim that "implicate[d] the 'right to be free ... from unwarranted intrusions into one's privacy.'" 641 F.2d at 1382 (quoting *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247–48, 22 L.Ed.2d 542 (1969)). We then reasoned that the interest at stake in *Hatheway* was similar to the substantive interest at stake in *Beller*. 641 F.2d at 1382. Because in *Beller* we decided that under the due process clause the right to engage in homosexual conduct merited "heightened solicitude," but not strict scrutiny, in *Hatheway* we adopted this assessment for the purposes of our fundamental rights equal protection analysis. Accordingly, we applied intermediate scrutiny to the Army's actions and held that "the selection of cases involving homosexual acts for Article 125 prosecutions" was permissible because such prosecutions bore "a substantial relationship to an important government interest." *Id.* Thus, we rejected Hatheway's claim based on an analysis of the fundamental rights branch of equal protection doctrine, the branch of equal protection doctrine upon which Watkins *does not* rely.

---

**23.** Under equal protection doctrine, heightened scrutiny not only applies to legal classifications that burden suspect or quasi-suspect classes but also applies to classifications that burden the exercise of fundamental or important substantive rights to engage in certain conduct. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 216–17 & nn.

14–15, 102 S.Ct. 2382, 2394–95 & nn. 14–15, 72 L.Ed.2d 786 (1982); *Maher v. Roe*, 432 U.S. 464, 470–78, 97 S.Ct. 2376, 2380–85, 53 L.Ed.2d 484 (1977); L. Tribe, American Constitutional Law § 16–7, at 1002–03, § 16–31, at 1089–90 & n. 1 (1978).

The Army argues that *Hatheway* should nonetheless be read as having decided the suspect class question. In support of this argument, the Army relies upon a single sentence in a footnote—the opinion's only reference to suspect class analysis. In footnote 6 we wrote: "Though '[t]he courts have not designated homosexuals a "suspect" or "quasi-suspect" classification so as to require more exacting scrutiny,' *DeSantis v. Pacific Tel. & Tel. Co.*, 608 F.2d 327, 333 (9th Cir.1979), heightened scrutiny is independently required where a classification penalizes the exercise of a fundamental right. *See Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed. 2d 600 (1969)." 641 F.2d at 1382 n. 6. Although I recognize that the intended purpose of this footnote is not entirely clear, I cannot fairly read this passing reference as an adjudication of the important and unresolved constitutional question whether homosexuals constitute a suspect or quasi-suspect class for the purpose of equal protection analysis. Rather, I read footnote 6 as simply clarifying the distinction between the suspect class and fundamental rights branches of equal protection doctrine while acknowledging that at the time of the *Hatheway* decision courts had not yet decided whether homosexuals constitute a suspect or quasi-suspect class. That the critical language in footnote 6 is taken directly from our opinion in *DeSantis*, 608 F.2d at 327, informs our reading. In *DeSantis*, we acknowledged that our court had not yet designated homosexuals as a suspect or quasi-suspect class, but we did not decide that homosexuals should not be so designated. *See infra* at 722–23. Similarly, in footnote 6 of *Hatheway*, we remarked on the existing state of the law with respect to homosexuals without deciding the open question whether homosexuals constitute a suspect or quasi-suspect class. In other words, I read *Hatheway* as interpreting the equal protection claim

presented as resting solely on the fundamental rights branch of equal protection analysis. *Hatheway* is also distinguishable from this case because, like both *Hardwick* and *Beller*, *Hatheway* involved a classification based on homosexual conduct, not homosexual orientation. As I note throughout my opinion, this distinction is relevant to an analysis of Watkins' particular equal protection claim.

Because I read *Hatheway* as not deciding the suspect class issue, and because the suspect class and fundamental rights branches of equal protection doctrine involve very separate inquiries, *see e.g., San Antonio School Indep. District v. Rodriguez*, 411 U.S. 1, 18–39, 93 S.Ct. 1278, 1288–1300, 36 L.Ed.2d 16 (1973); *Perry, Modern Equal Protection*, 79 Colum.L. Rev. 1023, 1074–83 (1979); *Developments in the Law—Equal Protection*, 82 Harv.L. Rev. 1065, 1087–1131 (1969), *Hatheway* does not stand in the way of Watkins' equal protection claim.[24]

Finally, I must reject the Army's contention that in *DeSantis v. Pacific Tel. & Tel. Co.*, 608 F.2d 327 (9th Cir.1979), our court held that homosexuals do not constitute a suspect or quasi-suspect class. In *DeSantis*, we considered whether homosexuals were a protected class within the meaning of 42 U.S.C. § 1985(3), which secures a right of action against private parties who conspire to deprive "any person or class of persons of the equal protection of the laws." We held that section 1985(3) protects only those groups that *have been* previously determined by Congress or the courts to need special Federal assistance in protecting their civil rights. 608 F.2d at 333.[25] Applying this standard, we concluded that homosexuals could not receive the protection of section 1985(3), in part because "[t]he courts *have not* designated homosexuals a 'suspect' or 'quasi-suspect' classification," 608 F.2d at 333 (emphasis

---

**24.** If *Hatheway* had decided that homosexuals do not constitute a suspect class, I would vote to have this *en banc* panel overrule it.

**25.** Along with subsequent cases, *DeSantis* has established that there are only two ways of making this showing under § 1985(3): (1) prov-

ing that Congress *has* enacted statutes offering special protection to the class; or (2) proving that courts *have* offered special protection to the class by designating it a suspect or quasi-suspect class. *Id., see also Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir.1985).

added). We did not, and did not need to, consider whether homosexuals *should be* considered a suspect class. Thus, our decision that section 1985(3) did not protect homosexuals turned simply on the point that courts had not *yet* designated homosexuals a suspect class. Although *DeSantis* does not articulate the reasons that section 1985(3) requires a *prior* governmental determination, it seems likely—since section 1985(3) authorizes suits against private individuals and requires no state action—that our court's interpretation of the statute was animated by concerns about providing potential defendants with sufficient notice of the statute's scope. *Cf. Marks v. United States,* 430 U.S. 188, 192, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (judicial enlargement of the scope of criminal statute without fair notice violates due process).

### C

While neither the Supreme Court nor the Ninth Circuit has decided the question presented in Watkins' appeal—whether persons of homosexual orientation constitute a suspect class under equal protection doctrine—several other circuits have considered the different but related question whether laws burdening the class of individuals engaging in homosexual *conduct* trigger heightened scrutiny under the equal protection clause. Only one circuit, however, has given the issue more than cursory treatment.[26] In *Padula v. Webster,* 822 F.2d 97 (D.C.Cir.1987), the District of Columbia Circuit rejected an equal protection challenge to the FBI's policy of discriminating against "practicing homosexuals" in its hiring decisions. The D.C. Circuit did not analyze whether the class of persons engaging in homosexual conduct satisfies the traditional indicia of suspectness, *see infra* at 723–728, but rather concluded summarily (as the Army urges us to do here) that "[i]t would be quite anomalous, on its face, to declare status defined by conduct that states may constitutionally criminalize as deserving of strict scrutiny under the equal protection clause." *Id.* at 103. The D.C. Circuit reasoned that "[i]f the [Supreme] Court [in *Hardwick*] was unwilling to object to state laws that criminalize the behavior that defines the class, it is hardly open to a lower court to conclude that state sponsored discrimination against the class is invidious. After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal." *Id.*

*Padula*'s reasoning rests on the false premise that *Hardwick* issues a blanket approval for discrimination against homosexuals. To repeat what I said above, *Hardwick* held only that the constitutionally protected right to privacy does not extend to homosexual sodomy. The case had nothing to do with equal protection. I see no principled way to transmogrify the Court's holding that the due process clause permits states to criminalize specific sexual conduct commonly engaged in by homosexuals into a holding that the equal protection clause gives states a license to pass "homosexual laws"—laws imposing special restrictions on gays because they are gay.

**26.** The Fifth and Tenth circuits have also considered this question. *Baker v. Wade,* 769 F.2d 289, 292 (5th Cir.1985) (en banc), (stressing that statute at issue was "directed at certain conduct, not at a class of people"), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986); *National Gay Task Force v. Board of Educ.,* 729 F.2d 1270, 1273 (10th Cir.1984) (statute at issue proscribes "public homosexual activity" by teachers), *aff'd without opinion by an equally divided Court,* 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985). Both of these circuits held that discrimination based on homosexual conduct does not merit heightened scrutiny under the equal protection clause, but neither circuit attempted any serious analysis of the issue. *See* *Baker v. Wade,* 769 F.2d at 292 (noting merely that the plaintiff "has not cited any cases holding, and we refuse to hold, that homosexuals constitute a suspect or quasi-suspect classification"); *National Gay Task Force,* 729 F.2d at 1273 (stating summarily that classification based on choice of sexual partners could not be suspect because Supreme Court has not held gender to be a suspect classification); *see also* *Rich v. Secretary of the Army,* 735 F.2d 1220, 1229 (10th Cir.1984) (citing without explanation *National Gay Task Force, Hatheway,* and *DeSantis* for the proposition that a "classification based on one's choice of sexual partners is not suspect").

Thus, I find *Padula* unpersuasive. Moreover, as I have reiterated thoughout this opinion, the regulations at issue here target orientation, not conduct—the trait at issue in *Padula.*

In sum, no federal appellate court[27] has decided the critical issue raised by Watkins' claim: whether persons of homosexual orientation constitute a suspect class under equal protection doctrine. To be sure, *Hardwick* forecloses Watkins from making a due process claim that the Army's regulations impinge on an asserted fundamental right to engage in homosexual sodomy. But Watkins makes no such claim. Rather, he claims only that the Army's regulations discriminate against him because of his membership in a disfavored group—homosexuals. This claim is not barred by precedent.

## IV

I now address the merits of Watkins' argument that the Army's regulations must be subjected to strict scrutiny because homosexuals constitute a suspect class under equal protection jurisprudence. The Supreme Court has identified several factors that guide our suspect class inquiry. I now turn to each of these factors.

The first factor the Supreme Court generally considers is whether the group at issue has suffered a history of purposeful discrimination. *See, e.g., Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3254–55; *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976); *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1293–94; *Frontiero,* 411 U.S. at 684–85, 93 S.Ct. at 1769–70 (plurality). As the Army concedes,[28] it is indisputable that "homosexuals have historically been the object of pernicious and sustained hostility." *Rowland v. Mad River Local School Dist.,* 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1376–77, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting from denial of cert.). Recently courts have echoed the same harsh truth: "Lesbians and gays have been the object of some of the deepest prejudice and hatred in American society." *High Tech Gays v. Defense Industrial Security Clearance Office,* 668 F.Supp 1361, 1369 (1987) (invalidating Defense Department practice of subjecting gay security clearance applicants to more exacting scrutiny than heterosexual applicants); *see also BenShalom v. Secretary of the Army,* 703 F.Supp. 1372 (1989) (homosexuals historically subject to discrimination).

Discrimination against homosexuals has been pervasive in both the public and private sectors. Legislative bodies have excluded homosexuals from certain jobs and schools, and have prevented homosexuals marriage. In the private sphere, homosexuals continue to face discrimination in jobs, housing and churches. *See generally* Note, *An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality,* 57 S.Cal.L.Rev. 797, 824–25 (1984) (documenting the history of discrimination). Moreover, reports of violence against homosexuals have become commonplace in our society. In sum, the discrimination faced by homosexuals is plainly no less pernicious or intense than the discrimination faced by other groups already treated as suspect classes, such as aliens or people of a particular national origin. *See, e.g., Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254 (identifying suspect groups).

The second factor that the Supreme Court considers in suspect class analysis is difficult to capsulize and may in fact represent a cluster of factors grouped around a central idea—whether the discrimination embodies a gross unfairness that is sufficiently inconsistent with the ideals of equal protection to term it "invidious." Consideration of this additional factor makes sense. After all, discrimination exists against some groups because the animus is warranted—no one could seriously argue that burglars form a suspect class. *See* Tribe, *The Puzzling Persistence of Process-Based Constitutional Theories,* 89 Yale L.J. 1063, 1075 (1980); Note, *supra,* at

---

**27.** One district court has decided the question. *See supra* n. 10.

**28.** *See* Army's Second Supplemental Brief at 10.

814–815 & nn. 115–116. In giving content to this concept of gross unfairness, the Court has considered (1) whether the disadvantaged class is defined by a trait that "frequently bears no relation to ability to perform or contribute to society," *Frontiero*, 411 U.S. at 686, 93 S.Ct. at 1770 (plurality); (2) whether the class has been saddled with unique disabilities because of prejudice or inaccurate stereotypes; and (3) whether the trait defining the class is immutable. *See Cleburne*, 473 U.S. at 440–44, 105 S.Ct. at 3254–57; *Plyler*, 457 U.S. at 216 n. 14, 219 n. 19, 220, 223, 102 S.Ct. at 2394 n. 14, 2395–96 n. 19, 2396, 2397–98; *Murgia*, 427 U.S. at 313, 96 S.Ct. at 2566–67; *Frontiero*, 411 U.S. at 685–87, 93 S.Ct. at 1769–71 (plurality). I consider these questions in turn.

Sexual orientation plainly has no relevance to a person's "ability to perform or contribute to society." Sergeant Watkins' exemplary record of military service stands as a testament to quite the opposite. Moreover, as the Army itself concluded, there is not a scintilla of evidence that Watkins' avowed homosexuality "had either a degrading effect upon unit performance, morale or discipline, or upon his own job performance." ER at 26c.

This irrelevance of sexual orientation to the quality of a person's contribution to society also suggests that classifications based on sexual orientation reflect prejudice and inaccurate stereotypes—the second indicium of a classification's gross unfairness. *See Cleburne*, 473 U.S. at 440–441, 105 S.Ct. at 3254–55. I agree with Justice Brennan that "discrimination against homosexuals is 'likely ... to reflect deep-seated prejudice rather than ... rationality.'" *Rowland*, 470 U.S. at 1014, 105 S.Ct. at 1376–77 (Brennan, J., dissenting from denial of cert.) (quoting *Plyler*, 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14).

The Army suggests that the opprobrium directed towards gays does not constitute prejudice in the pejorative sense of the word, but rather is simply appropriate public disapproval of persons who engage in immoral behavior. The Army equates ho-mosexuals with sodomists and justifies its regulations as simply reflecting a rational bias against a class of persons who engage in criminal acts of sodomy. In essence, the Army argues that homosexuals, like burglars, cannot form a suspect class because they are criminals.

The Army's argument rests on two false premises. First, as I have noted throughout this opinion, the class burdened by the regulations at issue in this case is defined by the sexual *orientation* of its members, not by their sexual conduct. *See supra* at 712–716. To my knowledge, homosexual orientation itself has never been criminalized in this country. Moreover, any attempt to criminalize the status of an individual's sexual orientation would present grave constitutional problems. *See generally Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

Second, little of the homosexual *conduct* covered by the regulations is criminal. The regulations reach many forms of homosexual conduct other than sodomy such as kissing, hand-holding, caressing, and hand-genital contact. Yet, sodomy is the only consensual adult sexual conduct that Congress has criminalized, 10 U.S.C. § 925. Indeed, the Army points to no law, federal or state, which criminalizes any form of private consensual homosexual behavior other than sodomy. The Army's argument that its regulations merely ban a class of criminals might be relevant, although not necessarily persuasive, if the class at issue were limited to sodomists. But the class banned from Army service is not comprised of sodomists, or even of homosexual sodomists; the class is comprised of persons of homosexual orientation whether or not they have engaged in sodomy.

Finally, I turn to immutability as an indicator of gross unfairness. The Supreme Court has never held that only classes with immutable traits can be deemed suspect. *Cf., e.g., Cleburne*, 473 U.S. at 442 n. 10, 105 S.Ct. at 3255–56 n. 10 (casting doubt on immutability theory); *id.* at 440–441 (stating the defining characteristics of suspect classes without mentioning immutability); *Murgia*, 427 U.S. at 313, 96 S.Ct. at 2566–

67 (same); *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1293–94 (same). I nonetheless consider immutability because the Supreme Court has often focused on immutability, *see, e.g., Plyler,* 457 U.S. at 220, 102 S.Ct. at 2396; *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770 (plurality), and has sometimes described the recognized suspect classes as having immutable traits, *see, e.g., Parham v. Hughes,* 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979) (plurality opinion) (describing race, national origin, alienage, illegitimacy, and gender as immutable).

It is clear that by "immutability" the Court has never meant strict immutability in the sense that members of the class must be physically unable to change or mask the trait defining their class. People can have operations to change their sex. Aliens can ordinarily become naturalized citizens. The status of illegitimate children can be changed. People can frequently hide their national origin by changing their customs, their names, or their associations. Lighter skinned blacks can sometimes "pass" for white, as can Latinos for Anglos, and some people can even change their racial appearance with pigment injections. *See* J. Griffin, Black Like Me (1977). At a minimum, then, the Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity. Reading the case law in a more capacious manner, "immutability" may describe those traits that are so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change them, regardless of how easy that change might be physically. Racial discrimination, for example, would not suddenly become constitutional if medical science developed an easy, cheap, and painless method of changing one's skin pigment. *See* Tribe, *supra,* at 1073–74 n. 52. *See generally* Note, *The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification,* 98 Harv. L.Rev. 1285, 1303 (arguing that the ability to change a trait is not as important as

whether the trait is a "determinative feature of personality").

With these principles in mind, I have no trouble concluding that sexual orientation is immutable for the purposes of equal protection doctrine. Although the causes of homosexuality are not fully understood, scientific research indicates that we have little control over our sexual orientation and that, once acquired, our sexual orientation is largely impervious to change. *See* Note, *supra,* 57 S.Cal.L.Rev. at 817–821 (collecting sources); *see also* L. Tribe, *supra* note 23, at 945 n. 17. Scientific proof aside, it seems appropriate to ask whether heterosexuals feel capable of changing *their* sexual orientation. Would heterosexuals living in a city that passed an ordinance burdening those who engaged in or desired to engage in sex with persons of the *opposite* sex find it easy not only to abstain from heterosexual activity but also to shift the object of their sexual desires to persons of the same sex? It may be that some heterosexuals and homosexuals can change their sexual orientation through extensive therapy, neurosurgery or shock treatment. *See* L. Tribe, *supra* note 23, at 945 n. 17. *But see* Note, *supra,* 57 S.Cal.L. Rev. at 820–21 & nn. 147–149. But the possibility of such a difficult and traumatic change does not make sexual orientation "mutable" for equal protection purposes. To express the same idea under the alternative formulation, I conclude that allowing the government to penalize the failure to change such a central aspect of individual and group identity would be abhorrent to the values animating the constitutional ideal of equal protection of the laws.

The final factor the Supreme Court considers in suspect class analysis is whether the group burdened by official discrimination lacks the political power necessary to obtain redress from the political branches of government. *See, e.g., Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255; *Plyler,* 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14; *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1293–94. Courts are understandably reluctant to extend heightened protection under equal protection doctrine to groups fully capable of securing their rights through the politi-

cal process. It cannot be seriously disputed, however, that homosexuals as a group cannot protect their right to be free from invidious discrimination by appealing to the political branches.

The very fact that homosexuals have historically been underrepresented in and victimized by political bodies is itself strong evidence that they lack the political power necessary to ensure fair treatment at the hands of government. In addition, homosexuals as a group are handicapped by structural barriers that operate to make effective political participation unlikely if not impossible. First, the social, economic, and political pressures to conceal one's homosexuality operate to discourage gays from openly protesting anti-homosexual governmental action. Ironically, by "coming out of the closet" to protest against discriminatory legislation and practices, homosexuals expose themselves to the very discrimination they seek to eliminate. As a result, the voices of many homosexuals are not even heard, let alone counted. *Cf.* J. Ely, *supra* note 21, at 163–64. "Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena." *Rowland,* 470 U.S. at 1014, 105 S.Ct. at 1376–77 (Brennan, J., dissenting from denial of cert.).

Even when gays do come out of the closet to participate openly in politics, the general animus towards homosexuality may render this participation ineffective. Many heterosexuals, including elected officials, find it difficult to empathize with and take seriously the arguments advanced by homosexuals, in large part because of the lack of meaningful interaction between the heterosexual majority and the homosexual minority. Most people have little exposure to gays, both because they rarely encounter gays [29] and because—as I noted above—homosexuals are often pressured into concealing their sexual identity. Thus, elected officials sensitive to public prejudice and ignorance, and insensitive to the needs of the homosexual constituency, may refuse to even consider legislation that even appears to be pro-homosexual. *See* Note, *supra,* 98 Harv.L.Rev. at 1304 n. 96. Indeed, the Army itself argues that its regulations are justified by the need to "maintain the public acceptability of military service," AR 635–200, ¶ 15–2(a), because "toleration of homosexual conduct ... might be understood as tacit approval" and "the existence of homosexual units might well be a source of ridicule and notoriety." Army's Opening Brief at 17, 19 n. 9, 30–31 n. 18. These barriers to the exercise of political power both reinforce and are reinforced by the underrepresentation of avowed homosexuals in the decisionmaking bodies of government and the inability of homosexuals to prevent legislation hostile to their group interests.[30] *See Frontiero,* 411 U.S. at 686 & n. 17, 93 S.Ct. at 1770 & n. 17 (plurality) (underrepresentation of women in government caused in part by history of discrimination); *Cleburne,* 473 U.S. at 445, 105 S.Ct. at 3257 (reasoning that the existence of legislation responsive to the needs of the mentally disabled belied the claim that they were politically powerless).

29. Because homosexuals are a minority and are frequently excluded from jobs, schools, churches, and heterosexual social circles, *see supra,* heterosexuals generally have relatively few opportunities to meet homosexuals and overcome their stereotypical thinking about homosexuality.

30. The Army claims that homosexuals cannot be politically powerless because two states, Wisconsin and California, have passed statutes prohibiting discrimination against homosexuals. Two state statutes do not overcome the long and extensive history of laws discriminating against homosexuals in all fifty states. *See, e.g.,* Note, *supra,* 57 S.Cal.L.Rev. at 803–07. Moreover, at the national level—the relevant political level for seeking protection from military discrimination—homosexuals have been wholly unsuccessful in getting legislation passed that protects them from discrimination.

The Army also argues that the repeal of sodomy statutes by many states proves that homosexuals are not politically powerless. However, sodomy statutes restrict the sexual freedom of heterosexuals as well as homosexuals. The repeal of sodomy statutes may thus reflect the liberalization of attitudes about heterosexual behavior more than it reflects the political power of homosexuals.

In sum, all of the relevant factors drive me to the conclusion that homosexuals constitute a suspect class for equal protection purposes. Moreover, the principles that animate equal protection doctrine—the principles that gave rise to these factors in the first place—reinforce that conclusion. *See also* J. Ely, *supra* note 21, at 162–64 (classifications based on homosexuality merit heightened scrutiny); L. Tribe, *supra* note 23, at 944–45 n. 17 (same).

## V

Having concluded that homosexuals constitute a suspect class, I now must subject the Army's regulations facially discriminating against homosexuals to strict scrutiny. Consequently, I may uphold the regulations only if they are " '*necessary* to promote a *compelling* governmental interest.' " *Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972) (quoting *Shapiro,* 394 U.S. at 634, 89 S.Ct. at 1331); *see also University of Calif. Regents v. Bakke,* 438 U.S. 265, 357, 98 S.Ct. 2733, 2782, 57 L.Ed.2d 750 (1978) (Opinion of Brennan, White, Marshall & Blackmun, JJ.). The requirement of necessity means that no less restrictive alternative is available to promote the compelling governmental interest. *See Dunn,* 405 U.S. at 343, 92 S.Ct. at 1003; *Bakke,* 438 U.S. at 357, 98 S.Ct. at 2782 (Opinion of four justices).

I recognize that even under strict scrutiny, my review of military regulations must be more deferential than comparable review of laws governing civilians. *See Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986).

While the Supreme Court does not "purport to apply a different equal protection test because of the military context, [it does] stress the deference due congressional choices among alternatives in exercising the congressional authority to raise and support armies and make rules for their governance." *Rostker v. Goldberg,* 453 U.S. 57, 71, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981) (citing *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975)). I question whether this special deference is appropriate in Watkins' case given that Congress has chosen not to regulate homosexuality or any form of sexual conduct engaged in by military personnel save for one exception—Congress has chosen to criminalize sodomy by military personnel whether committed "with another person *of the same or opposite* sex." 10 U.S.C. § 925 (emphasis added). Hence, if anything, section 925 reflects an absence of congressional intent to discriminate on the basis of sexual orientation.

In any case, even granting special deference to the policy choices of the military, I must reject many of the Army's asserted justifications because they illegitimately cater to private biases. For example, the Army argues that it has a valid interest in maintaining morale and discipline by avoiding hostilities and " 'tensions between known homosexuals and other members [of the armed services] who despise/detest homosexuality.' " Army's Opening Brief at 17 (quoting and incorporating into their argument *Beller,* 632 F.2d at 811); *see also id.* at 17–18, 19 n. 9, 30, 30–31 n. 18; Army's Second Supp.Brief at 30–31 & n. 17; AR 635–200, ¶ 15–1(a).[31] The Army also

---

**31.** A somewhat different rationale conceivably could also underlie certain cryptic statements the Army makes about its concerns regarding "close conditions affording minimal privacy," " 'potential for difficulties arising out of possible close confinement,' " and "the intimacy of barrack's life." AR 635–200, ¶ 15–1(a); Army's Opening Brief at 15 (quoting *Beller,* 632 F.2d at 812); Army's Second Supp. Brief at 19 n. 9, 30. Conceivably, the Army could be concerned in part that the presence of gays in the ranks will create *sexual* tensions—as distinguished from tensions arising from prejudice—because of the practical necessity of housing gays with personnel of the same sex. The Army, however, never

articulates this concern. Thus it gives no indication that it regards this concern as compelling or that it believes that weeding *all* homosexuals out of the military—even soldiers as exemplary as Sergeant Watkins—is necessary to advance a compelling military interest in reducing sexual tensions. Indeed, at points in its argument the Army implies that it is concerned about the close confinement of soldiers only insofar as such confinement might exacerbate hostilities and tensions assertedly created by the prejudice some heterosexuals have against homosexuals. *See* Army's Opening Brief at 17, 31 n. 18. Even if the Army had raised the argument that excluding homosexuals from barracks reduces

expresses its " 'doubts concerning a homosexual officer's ability to command the respect and trust of the personnel he or she commands' " because many lower-ranked heterosexual soldiers despise and detest homosexuality. *See* Army's Second Supp. Brief at 30–31 (quoting and incorporating *Beller*, 632 F.2d at 811); *see also id.* at 31 n. 17; Army's Opening Brief at 17–18, 19 n. 9, 30; AR 635–200, ¶ 15–1(a). Finally, the Army argues that the presence of gays in its ranks "might well be a source of ridicule and notoriety, harmful to the Army's recruitment efforts" and to its public image. Army's Opening Brief at 31 n. 18; *see also id.* at 15, 17, 19 n. 9, 30; AR 635–200, ¶ 15–1(a).

These concerns strike an all-too-familiar chord. For much of our history, the military's fear of racial tension kept black soldiers separated from whites. As recently as World War II both the Army chief of staff and the Secretary of the Navy justified racial segregation in the ranks as necessary to maintain efficiency, discipline, and morale. *See* G. Ware, William Hastie: Grace Under Pressure 99, 134 (1984).[32] Today, it is unthinkable that the judiciary would defer to the Army's prior "professional" judgment that black and white soldiers had to be segregated to avoid interracial tensions. Indeed, the Supreme Court has decisively rejected the notion that private prejudice against minorities can ever justify official discrimination, even when those private prejudices create real and legitimate problems. *See Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984).

In *Palmore*, a state granted custody of a child to her father because her white mother had remarried a black man. The state rested its decision on the best interests of the child, reasoning that, despite improvements in race relations, the social reality was that the child would likely suffer social stigmatization if she had parents of different races. A unanimous Court, in an opinion by Chief Justice Burger, conceded the importance of the state's interest in the welfare of the child, but nonetheless reversed with the following reasoning:

> It would ignore reality to suggest that racial and ethnic prejudices do not exist or that all manifestations of those prejudices have been eliminated. . . . The question, however, is whether the reality of private biases and the possible injury they might inflict are permissible considerations for removal of an infant child from the custody of its natural mother. We have little difficulty concluding that they are not. The Constitution cannot control such prejudices but neither can it tolerate .them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.

*Id.* at 433, 104 S.Ct. at 1882. Thus, *Palmore* forecloses the Army from justifying its ban on homosexuals on the ground that private prejudice against homosexuals would somehow undermine the strength of our armed forces if homosexuals were permitted to serve. *See also Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3258–60 (even under rationality review of discrimination against group that is neither suspect nor quasi-suspect, catering to private prejudice is not a cognizable state interest).

The Army's defense of its regulations, however, goes beyond its professed fear of prejudice in the ranks. Apparently, the Army believes that its regulations rooting out persons with certain sexual tendencies are not merely a response to prejudice, but are also grounded in legitimate moral norms. In other words, the Army believes that its ban against homosexuals simply

---

sexual tension and had shown that reducing sexual tension serves a compelling interest, nothing in the record even suggests that a per se rule banning all homosexuals from the Army would be the least restrictive method of advancing this interest.

**32.** It took an Executive Order in 1945 by President Truman, issued against the advice of almost every admiral and general, to integrate our armed forces. M. Miller, Plain Speaking: An Oral Biography of Harry S. Truman 79 (1983). It is also interesting to note that during World War II the Army deliberately minimized any publicity about the existence of black soldiers because it feared that such publicity would tarnish the Army's public image. *See* G. Ware, *supra,* at 100.

codifies society's moral consensus that homosexuality is evil. Yet, even accepting *arguendo* this proposition that anti-homosexual animus is grounded in morality (as opposed to prejudice masking as morality), and assuming further that the Army is an appropriate governmental body to articulate moral norms, equal protection doctrine does not permit notions of majoritarian morality to serve as compelling justification for laws that discriminate against suspect classes.

A similar principle animates *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), in which the Supreme Court struck down a Virginia statute outlawing marriages between whites and blacks. Although the Virginia legislature may have adopted this law in the sincere belief that miscegenation—the mixing of racial blood lines—was evil,[33] this moral judgment could not justify the statute's discrimination on the basis of race. Like the Army's regulations proscribing sexual acts only when committed by homosexual couples, the Virginia statute proscribed marriage only when undertaken by mixed-race couples. In both cases, the government did not prohibit certain conduct, it prohibited certain conduct selectively—only when engaged in by certain classes of people. Although courts may sometimes have to accept society's moral condemnation as a justification even when the morally condemned activity causes no harm to interests outside notions of morality, *see Hardwick*, 478 U.S. at 196, 106 S.Ct. at 2847 (accepting moral condemnation as justification under rationality review), our deference to majoritarian notions of morality must be tempered by the equal protection principles which require that those notions be applied evenhandedly. Laws that limit the acceptable focus of one's sexual desires to members of the opposite sex, like laws that limit one's choice of spouse (or sexual partner) to members of the same race, can-

not withstand constitutional scrutiny absent a compelling governmental justification. This requirement would be reduced to a nullity if the government's assertion of moral objections only to interracial couples or only to homosexual couples could itself serve as a tautological basis for the challenged classification.

The Army's remaining justifications for discriminating against homosexuals may not be illegitimate, but they bear little relation to the regulations at issue. For example, the Army argues that military discipline might be undermined if emotional relationships developed between homosexuals of different military rank. Army's Opening Brief at 17–18, 19 n. 9, 30; AR 635–200, ¶ 15–1(a). Although this concern might be a compelling and legitimate military interest, the Army's regulations are poorly tailored to advance that interest. No one would suggest that heterosexuals are any less likely to develop emotional attachments within military ranks than homosexuals. Yet the Army's regulations do not address the problem of emotional attachments between male and female personnel, which presumably subjects military dicipline to similar stress. Surely, the Army's interest in preventing emotional relationships that could erode military discipline would be advanced much more directly by a ban on all sexual contact between members of the same unit, whether between persons of the same or opposite sex. *Cf. Cleburne*, 473 U.S. at 449–50, 105 S.Ct. at 3259–60 (rejecting certain asserted justifications under *rationality* review where the justification would extend to other groups but the challenged classification did not). Here the Army's regulations disqualify all homosexuals whether or not they have developed any emotional or sexual relationships with other soldiers.

Also bearing little relation to the regulations is the Army's professed concern with breaches of security. AR 635–200,

---

**33.** Indeed, the trial judge in *Loving* admonished Mildred and Richard Loving that interracial marriage was a violation of the Christian ethic of racial purity: "Almighty God created the races, white, black, yellow, malay and red, and he placed them on separate continents. And

but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix. *Loving*, 388 U.S. at 3, 87 S.Ct. at 1819.

¶ 15–1(a). Certainly the Army has a compelling interest in excluding persons who may be susceptible to blackmail. It is evident, however, that homosexuality poses a special risk of blackmail only if a homosexual is secretive about his or her sexual orientation. The Army's regulations do nothing to lessen this problem. Quite the opposite, the regulations ban homosexuals only after they have declared their homosexuality or have engaged in known homosexual acts. The Army's concern about security risks among gays could be addressed in a more sensible and less restrictive manner by adopting a regulation banning only those gays who had lied about or failed to admit their sexual orientation.[34] In that way, the Army would *encourage*, rather than discourage, declarations of homosexuality, thereby reducing the number of closet homosexuals who might indeed pose a security risk. Moreover, even if banning homosexuals could lessen security risks, there appears to be no reason for treating homosexuality as a nonwaivable disqualification from military service while treating other more serious potential sources of blackmail as waivable disqualifications. *See* AR 635–200, ¶ 14–12(c) & (d) (making drug abuse and the commission of other serious military offenses waivable disqualifications).

## CONCLUSION

The Army's regulations violate the constitutional guarantee of equal protection of the laws because they discriminate against persons of homosexual orientation, a suspect class, and because the regulations are not necessary to promote a legitimate compelling governmental interest. I would thus reverse the district court's rulings denying Watkins' motion for summary judgment and granting summary judgment in favor of the Army, and remand with instructions to enter a declaratory judgment that the Army Regulations A.R. 635–200, Chapter 15, and 601–280, ¶ 2–21(c), are constitutionally void on their face, and to enter an injunction requiring the Army to consider Watkins' reenlistment application without regard to his sexual orientation.

CANBY, Circuit Judge, concurring:

I concur wholeheartedly in Judge Pregerson's majority opinion. My concurrence indicates no retreat, however, from my conviction that the Army's discrimination against Watkins because of his homosexual orientation denies him equal protection of the laws. I joined Judge Norris' eloquent opinion so holding in *Watkins II*, and I agree with everything Judge Norris says today on the equal protection point. Because we are en banc, and the constitutional issue is a recurring one, I think I may appropriately reach it even though equitable estoppel may dispose of the case.

CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting.

Sergeant Perry Watkins has proven himself to be a loyal, talented, and honest soldier. The majority is rightly impressed by Watkins' uniformly outstanding performance evaluations and the persistent efforts of his immediate superiors to insure his continued advancement in the United States Army. I share the majority's admiration of Watkins' fine service to his country. Watkins' record has but one blemish under Army regulations: his homosexuality. Watkins brought this lawsuit seeking to enjoin the Army from considering his homosexuality in passing upon the merits of his reenlistment application.

During Watkins' tenure, Army regulations have always precluded the enlistment of homosexuals. The gravamen of Watkins' claim is that such discrimination against homosexuals constitutes a violation of his right to equal protection under the fifth amendment. The en banc majority shies away from this issue, however, and grants Watkins the relief he seeks on an alternative rationale.[1] The majority holds

---

**34.** Watkins has forthrightly reported his homosexuality since his induction in 1967, and his homosexuality was always a matter of common knowledge. There is no suggestion in the record before us that Watkins ever feared public disclosure of his homosexualty.

**1.** A majority of the active judges on this court voted to consider en banc whether equal protec-

that the Army is equitably estopped from refusing to reenlist him due to the Army's long-standing knowledge of his homosexuality. I dissent from this holding as an unwarranted application of common law principles to matters within the military's expertise.

## I

The original panel in this case held that courts should not review internal military affairs absent "an allegation of the deprivation of a constitutional right or an allegation that the military has acted in violation of applicable statutes or its own regulations." *Watkins v. United States Army,* 721 F.2d 687, 690 (9th Cir.1983) ("*Watkins I*"). The *Watkins I* court took this prerequisite to judicial review of internal military

decisions verbatim from the test set forth in *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971), for determining the justiciability [2] of claims concerning internal military affairs.

The first prong of the *Mindes* test requires "(a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures." *Mindes,* 453 F.2d at 201. If these prerequisites are met, a court proceeds to the second prong, which requires weighing four factors.[3] Most circuits have adopted the Fifth Circuit's *Mindes* test.[4] Furthermore, *Mindes* is well-established in the Ninth Circuit.[5]

tion doctrine prohibits the Army's discrimination against homosexuals. While I do not dispute the court's en banc power to address the equitable estoppel claim, I do not interpret the court's decision to do so as meaning that the *Watkins I* decision conflicts with prior decisions of this court. Watkins argues that *Watkins I* conflicts with three Ninth Circuit decisions. His contention is frivolous. In *Lavin v. Marsh,* 644 F.2d 1378 (9th Cir.1981), the court rejected on the merits an Army reservist's argument that the Army Reserve was equitably estopped from enforcing an age-based years-of-service limitation. As the justiciability issue was neither raised nor addressed, *Lavin* is of no precedential value on this point. Neither is *Watkins I* in conflict with *Jablon v. United States,* 657 F.2d 1064 (9th Cir.1981). *Jablon* held that the government had not waived its sovereign immunity with regard to a promissory estoppel claim by a service member. How this case advances Watkins' argument is incomprehensible. Finally, Watkins is wrong in arguing that *Watkins I* conflicts with *Cortese v. United States,* 782 F.2d 845 (9th Cir.1986). As the Army notes, the plaintiff in that case was a private contractor, so it did not raise the military discipline concerns at the heart of the justiciability doctrine. The *Mindes* doctrine does not present an obstacle to civilian claims against the military. *Bledsoe v. Webb,* 839 F.2d 1357, 1359 (9th Cir.1988).

**2.** The *Mindes* doctrine is analogous to the political question doctrine in limiting the types of disputes which courts are competent to resolve. *See Khalsa v. Weinberger,* 779 F.2d 1393, 1395 n. 1 (9th Cir.), *prior judgment reaff'd,* 787 F.2d 1288 (9th Cir.1985). Consequently, the doctrine refers "to 'reviewability' rather than to 'subject matter jurisdiction.'" *Id.* at 1396 n. 2. This dissent will use the term "justiciability" synonymously with "reviewability."

**3.** The factors weighed in the second prong include: the nature and strength of plaintiff's claim; the potential injury to plaintiff; the type and degree of anticipated interference with the military function; and the level of military expertise and discretion. As Watkins' equitable estoppel claim fails to satisfy the first prong of the *Mindes* test, the dissent does not analyze these four factors. In addition, this case does not require us to decide whether the cases rejecting constitutional claims under *Mindes'* second prong do so on the merits or on a justiciability basis. *Compare Khalsa,* 779 F.2d at 1400 (rejecting suit bringing first amendment challenge to Army appearance regulations under *Mindes'* second prong), *with Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986) (rejecting suit bringing first amendment challenge to Air Force's appearance regulations on the merits).

**4.** *See, e.g., Costner v. Oklahoma Army Nat'l Guard,* 833 F.2d 905, 907 (10th Cir.1987) (per curiam); *Stinson v. Hornsby,* 821 F.2d 1537, 1540 (11th Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 402, 102 L.Ed.2d 390 (1988); *Williams v. Wilson,* 762 F.2d 357, 359 (4th Cir.1985); *Ogden v. United States,* 758 F.2d 1168, 1179 n. 7 (7th Cir.1985); *Penagaricano v. Llenza,* 747 F.2d 55, 60–61 (1st Cir.1984); *Nieszner v. Mark,* 684 F.2d 562, 564 (8th Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1273, 75 L.Ed.2d 494 (1983); *cf. Bois v. Marsh,* 801 F.2d 462, 468 (D.C.Cir. 1986); *Schultz v. Wellman,* 717 F.2d 301, 306–07 (6th Cir.1983); *Crawford v. Cushman,* 531 F.2d 1114, 1120 (2d Cir.1976). *But see Dillard v. Brown,* 652 F.2d 316, 323 (3d Cir.1981).

**5.** *Christoffersen v. Washington State Air Nat'l Guard,* 855 F.2d 1437, 1440–45 (9th Cir.1988); *Sandidge v. State of Wash.,* 813 F.2d 1025, 1026 (9th Cir.1987); *Sebra v. Neville,* 801 F.2d 1135,

In a straightforward application of *Mindes'* first prong, the *Watkins I* panel found a claim of equitable estoppel to be nonjusticiable because this type of common law claim is not premised on the deprivation of constitutional rights or the violation of applicable statutes or regulations. These prerequisites to judicial scrutiny of military affairs serve to advance a widely recognized goal: minimizing "judicial inquiry into, and hence intrusion upon, military matters." *United States v. Stanley,* 483 U.S. 669, 107 S.Ct. 3054, 3063, 97 L.Ed.2d 550 (1987). While the majority acknowledges that our cases have accepted the limited nature of judicial regulation of military affairs, it fails to explore how the *Mindes* prerequisites further this objective. Indeed, the majority does not argue that limiting judicial review to federal constitutional, statutory, and regulatory claims is a bad idea. The majority simply concludes—in *ad hoc* fashion—that the *Mindes* prerequisites should be ignored in this case.[6]

## II

The Supreme Court held in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), that the government has no Federal Tort Claims Act liability for injuries to military service members arising out of or in the course of activity incident to military service. The Court's holding in *Feres* teaches that these are the "*type[s]* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *United States v. Shearer,* 473 U.S. 52, 59, 105 S.Ct. 3039, 3043–44, 87 L.Ed.2d 38 (1985). "*Feres* seems to be best explained by the 'peculiar and special relationship of the soldier to his superiors, [and] the effects of the maintenance of such suits on discipline....'" *United States v. Muniz,* 374 U.S. 150, 162, 83 S.Ct. 1850, 1857–58, 10 L.Ed.2d 805 (1963) (quoting *United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954)).

The Court recently has held that the military discipline rationale of the *Feres* doctrine precludes a tort action by a military service member even when a *civilian* government employee is alleged to be the tortfeasor. *United States v. Johnson,* 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987). The Court emphasized that "military discipline involves not only obedience to orders, but more generally duty and loyalty to one's service and to one's country." *Id.* 107 S.Ct. at 2069. The Court concluded that the mere pendency of a suit against the government by a service member "could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word." *Id.* While the suit before the Court involved service-related injuries, the Court's reasoning underscores that *all* suits by active military personnel against the government they serve have the potential to undermine discipline.

The Supreme Court's decision in *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), relied upon *Feres'* military discipline rationale to conclude that enlisted military personnel cannot maintain a *Bivens*[7] suit to recover damages from a superior officer for alleged constitutional violations. In *Chappell,* five Navy enlisted men alleged that certain officers discriminated against them on the basis of race in making duty assignments and performance evaluations. *Id.* at

---

1141 (9th Cir.1986); *Khalsa,* 779 F.2d at 1398; *Gonzalez v. Department of Army,* 718 F.2d 926, 929 (9th Cir.1983); *Wallace v. Chappell,* 661 F.2d 729, 732–33 (9th Cir.1981), *rev'd on other grounds,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Schlanger v. United States,* 586 F.2d 667, 671 (9th Cir.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979).

**6.** It is ironic that the majority concludes that it "must determine the preliminary question whether Watkins has exhausted available intra-service remedies." Opinion at 705. Exhaustion of intraservice remedies is, of course, the other half of *Mindes'* first prong. As with the limitation to federal claims, exhaustion serves to limit judicial interference with military matters.

**7.** *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

297, 103 S.Ct. at 2364. But the Court opined that "[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the very heart of the necessarily unique structure of the Military Establishment." *Id.* at 300, 103 S.Ct. at 2365–66.

While the Court in *Chappell* identified the officer-subordinate relationship as especially important, the Court also noted that "[i]t is clear that the Constitution contemplated that the Legislative Branch have plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline...." *Id.* at 301, 103 S.Ct. at 2366. This presumption against "congressionally uninvited intrusion into military affairs by the judiciary" explains why the Court has recently expanded upon *Chappell* to hold that a damages remedy is unavailable even though the defendants were not plaintiff's superior officers and may well have been civilian personnel. *Stanley,* 107 S.Ct. at 3061, 3063. The Court recognizes that military discipline is adversely affected whenever a service member brings suit in connection with injuries incident to military service.

## A

The Court's decision in *Chappell* reversed the Ninth Circuit's ruling that the Navy men had alleged a sufficient claim for damages. Finding *Mindes'* first prong satisfied, the Ninth Circuit had remanded the case to the district court for consideration of the second prong of *Mindes:* the weighing of four factors to determine the case's appropriateness for judicial resolution. *Chappell,* 661 F.2d at 734. While this circuit expressed some initial uncertainty over the continued efficacy of the *Mindes* test in the wake of the Supreme Court's decision in *Chappell,* courts subsequently have applied the *Mindes* jurisdictional test to claims not directly precluded by the Supreme Court's *Chappell* decision.[8]

Broadly speaking, *Mindes* applies to two types of claims which *Chappell* does not expressly foreclose: (1) claims strictly seeking injunctive or declaratory relief,[9] and (2) damages claims based upon an explicit statute, such as 42 U.S.C. § 1983 or § 1985(3).[10] As Watkins' suit solely seeks

---

**8.** In *Mollnow v. Carlton,* 716 F.2d 627 (9th Cir. 1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126 (1984), the court found that the "precise holding" of *Chappell* did not dictate rejection of plaintiff's claim that defendants had violated 42 U.S.C. § 1985(1). Plaintiff, a former pilot and officer in the Air Force Reserve, sued commanding officers and attending medical personnel. The court noted that *Chappell* had merely rejected an implied damages remedy, but that section 1985(1) expressly authorized a damages award. *Id.* Nonetheless, the court held that plaintiff's section 1985(1) claim was properly dismissed because such liability would conflict with *Chappell's* underlying rationales. Given this disposition, the court did not address whether *Mindes* "survived" *Chappell. Mollnow,* 716 F.2d at 630 n. 5.

**9.** *Chappell* noted that service members are not precluded from obtaining any relief whatsoever for constitutional violations, citing to three cases which involved injunctive or declaratory relief. *Chappell,* 462 U.S. at 304, 103 S.Ct. at 2367–68. The Ninth Circuit in *Mollnow* noted that none of the cited cases was a "suit for damages." *Mollnow,* 716 F.2d at 629 n. 4. The Supreme Court has subsequently acknowledged

that these citations "referred to redress designed to halt or prevent the constitutional violation rather than the award of money damages." *Stanley,* 107 S.Ct. at 3063. *See Ogden,* 758 F.2d at 1175 ("We hold that *Chappell* does not preclude an equitable remedy").

**10.** [T]he [*Chappell*] Court's rationale has left the field open for Congress to enact legislation authorizing servicemen's constitutional [damages] claims against their superiors." *Christoffersen,* 855 F.2d at 1441. As suits against a state's National Guard involve state action, section 1983 provides a potential basis for a statutory damages claim. The *Christoffersen* court declined to decide "whether *Chappell* bars any or all section 1983 claims for alleged civil rights violations by military personnel." *Id.* This circuit has also left open the question of whether *Chappell* is inconsistent with a damages suit pursuant to section 1985(3). *See Miller v. Newbauer,* 862 F.2d 771, 775 (9th Cir.1988).

Other circuits have concluded that *Chappell's* reasoning is inconsistent with a damages action under section 1983 against state National Guard officials. *See Holdiness v. Stroud,* 808 F.2d 417, 423 (5th Cir.1987); *Jorden v. National Guard Bureau,* 799 F.2d 99, 108 (3d Cir.1986), *cert.*

declaratory and injunctive relief, it does not run afoul of *Chappell*'s express holding.

## B

The Court's rejection of a damages remedy against military officials in *Chappell*, and its implied acceptance of claims seeking only declaratory or injunctive relief, highlight the Court's appreciation of the differing nature of these two types of claims. The Court has held that federal executive officials are entitled to qualified immunity against damages claims because damages threaten to undermine "the vigorous exercise of official authority." *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910–11, 57 L.Ed.2d 895 (1978); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[11] But an absolute immunity from suits seeking damages "would seriously erode the protection provided by basic constitutional guarantees." *Butz*, 438 U.S. at 505, 98 S.Ct. at 2910. Similarly, the availability of certain types of injunctive suits against the military assures "that all individuals, whatever their position in government, are subject to *federal* law...." *Butz*, 438 U.S. at 506, 98 S.Ct. at 2910–11 (emphasis added).

While suits seeking injunctive relief against military officers are a critical means of assuring the rule of law, claims for injunctive relief do require the courts to second-guess the "considered professional judgment" of military authorities. *Goldman v. Weinberger*, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986) (rejecting first amendment suit seeking to enjoin the Air Force from enforcing a regulation which prohibited plaintiff from wearing yarmulke). Indeed the *Mindes* decision itself arose solely in the context of a claim for injunctive and declaratory relief in connection with plaintiff's forced separation from active duty. *Mindes*, 453 F.2d at 198.

As suits for injunctive relief interfere with the military mission, albeit to a lesser extent than suits seeking damages, *Chappell* cannot be read as holding that all injunctive suits are equally well-taken. Accordingly, *Mindes* appropriately limits the types of claims which may be asserted to those raising federal constitutional, statutory or regulatory matters. "However broad a federal court's discretion concerning equitable remedies, it is absolutely clear ... that in a nondiversity suit a federal court's power to grant even equitable relief depends on the presence of a substantive right derived from *federal* law." *Bivens*, 403 U.S. at 400, 91 S.Ct. at 2006–007 (Harlan, J., concurring) (emphasis added).

For similar reasons, the Supreme Court has declined to erect the eleventh amendment as a complete bar to federal court jurisdiction of claims alleging unconstitutional conduct by a state actor. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). "[T]he *Young* doctrine rests on the need to promote the vindication of federal rights." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 105, 104 S.Ct. 900, 910, 79 L.Ed.2d 67 (1984). "*Young*'s applicability has been tailored to conform as precisely as possible to those specific situations in which it is 'necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Papasan v. Allain*, 478 U.S. 265, 277, 106 S.Ct. 2932, 2939–40, 92 L.Ed.2d 209 (1986) (quoting *Pennhurst*, 465 U.S. at 105, 104 S.Ct. at 910).

The eleventh amendment analogy is apt because it also requires balancing the need to vindicate federal rights with the obligation not to intrude excessively upon an

*denied,* —— U.S. ——, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987); *Brown v. United States,* 739 F.2d 362, 366–67 (8th Cir.1984), *cert. denied,* 473 U.S. 904, 105 S.Ct. 3524, 87 L.Ed.2d 650 (1985); *Martelon v. Temple,* 747 F.2d 1348, 1350–51 (10th Cir. 1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985). As Watkins' suit does not seek damages pursuant to section 1983, this case does not raise the question of whether

obtaining such damages against state National Guard officers is inconsistent with the *Chappell* decision's underlying rationales.

**11.** *Cf. Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (interpreting the eleventh amendment as precluding the retroactive award of monetary benefits, while allowing prospective injunctive relief).

area presumptively off-limits to the federal courts. A state's "constitutional immunity" can be likened to the military's "specialized society separate from civilian society." *Compare Pennhurst*, 465 U.S. at 105, 104 S.Ct. at 910, *with Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974). But in the eleventh amendment area, a state's immunity stands impenetrable where a plaintiff fails to allege that state officials have violated federal law. "A federal court's grant of relief against state officials on the basis of state law ... does not vindicate the supreme authority of federal law." *Pennhurst*, 465 U.S. at 106, 104 S.Ct. at 911. In a like manner, the *Mindes* test insures that judicial intrusions into military matters are limited to the vindication of federal interests.

### C

There is no doubt that the majority's intrusion into military affairs, unjustified by important federal interests, will have a disruptive effect upon military discipline. The *Watkins I* panel stated that "[i]t is clear that a court using its equitable powers to compel superior officers to disobey regulations at the instance of a subordinate is a serious threat to military discipline." *Watkins I*, 721 F.2d at 690. The majority attempts to downplay its disruption of military discipline by emphasizing the "stringent requirements that must be satisfied before the government will be estopped." Opinion at 706. But the majority fundamentally fails to understand the nature of military discipine as articulated by the Supreme Court.

As noted above, the Court's decisions in *Stanley* and *Johnson* reveal that the mere pendency of a lawsuit by a service member against the government he serves has an adverse impact on military discipline in the "broadest sense of the word." *Johnson*, 107 S.Ct. at 2069. *Stanley* cautioned against the dangers of "compelled depositions and trial testimony by military officers concerning the details of their military commands." *Stanley*, 107 S.Ct. at 3063; *see also Khalsa*, 779 F.2d at 1395 n. 1 (litigation "could interfere with military

discipline and efficient operations by requiring superior officers to submit to examinations"). Litigation is inherently disruptive, and entails the risk of "erroneous judicial conclusions (which would becloud military decision-making)." *Stanley*, 107 S.Ct. at 3063. Litigation has certain "social costs[, which] include the expenses of litigation, [and] the diversion of official energy from pressing public issues...." *Harlow*, 457 U.S. at 814, 102 S.Ct. at 2736. Thus, the majority's prediction that the United States military generally will be successful in estoppel suits does not carry the day.

### III

The majority fails to marshal any case law in support of its holding that a common law estoppel claim is justiciable against the military. In fact, the majority distorts our prior case law to make it appear as if its holding is uncontroversial. The majority's steadfast desire to avoid constitutional adjudication does not support its destruction of a valuable justiciability doctrine.

### A

The majority begrudgingly acknowledges that this court has adopted the *Mindes* test "in part," citing our decision in *Chappell* in support of this characterization. Opinion at 705–706. The court in *Chappell* did state in a footnote that "[w]e express no view as to whether the *Mindes* test should govern federal nonconstitutional claims," 661 F.2d at 733 n. 5, but this hardly supports minimizing this court's faithfulness to *Mindes'* first prong.

First, the majority itself concedes that "[s]ome of our cases following *Wallace v. Chappell* have used language indicating that an internal military decision is reviewable only when the plaintiff alleges a constitutional, statutory, or regulatory violation." Opinion at 705 n. 10. In fact, *all our cases* following *Chappell* have insisted that plaintiff's claims allege a federal constitutional, statutory, or regulatory violation. Second, the majority takes *Chappell's* footnote completely out of context.

In context, *Chappell's* caveat strongly supports the dissent's position.

The Ninth Circuit in *Chappell* was greatly concerned that unnecessary judicial review of military matters would adversely affect discipline. Consequently, the court did indeed limit its adoption of *Mindes'* first prong, permitting a *narrower* group of claims raising only "recognized" constitutional rights. 661 F.2d at 734. In explaining why it limited itself to recognized constitutional claims, the court stated: "We mean only that the allegations *must amount to more than a traditional state law claim." Id.* (emphasis added). This complete presentation of our decision in *Chappell* demonstrates that that court's adoption "in part" of *Mindes* is of no solace to the majority.[12]

### B

The majority states that it eschews the *Mindes* test in this case because "[s]uch an extension of the *Mindes* reviewability doctrine to bar equitable relief would improperly require cases against the military to be decided on the broadest possible grounds rather than on the narrowest." Opinion at 706. But the majority's desire to avoid the difficult equal protection question presented in this case is no reason to dispense with well-established case law.

This type of policy concern does not override the established limitations of the federal courts. Plaintiffs in the *Pennhurst* case similarly argued that the Court's eventual disposition would conflict with "the policy of avoiding unnecessary constitutional decisions...." *Pennhurst,* 465 U.S. at 121, 104 S.Ct. at 919. In that area of the law, the Court held that "such considerations of policy cannot override the constitutional limitation on the authority of the federal judiciary...." *Id.* at 123, 104 S.Ct. at 920.

Likewise, this policy consideration cannot override the established policy against judicial regulation of military matters absent pressing federal interests.

### IV

The majority's holding on the merits of Watkins' equitable estoppel claim is also entirely unpersuasive. While the Supreme Court has declined to accept a government invitation to adopt a rule that equitable estoppel may never be invoked against the government, *Heckler v. Community Health Services,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984), the Court has yet to uphold even one such claim. Notably, the Court has reversed this court's invocation of equitable estoppel many times, on facts no less sympathetic than Watkins'. *See, e.g., INS v. Miranda,* 459 U.S. 14, 17–19, 103 S.Ct. 281, 282–84, 74 L.Ed.2d 12 (1982) (per curiam) (reversing Ninth Circuit decision equitably estopping INS from denying resident status to alien spouse of citizen when petitioner became ineligible during INS delay in processing application); *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam) (reversing Ninth Circuit decision equitably estopping *INS* from denying citizenship to Filipino war veteran); *see also Montana v. Kennedy,* 366 U.S. 308, 314–15, 81 S.Ct. 1336, 1340–41, 6 L.Ed.2d 313 (1961) (government not estopped to deny citizenship to child of U.S. citizen born while his mother was living abroad, even though government official advised her that she could not return to the U.S. to have her baby).

The majority's assessment that the Army's treatment of Watkins amounts to "affirmative misconduct" is especially unconvincing and demands refutation. The Supreme Court stated in *Heckler* that

---

12. The majority's citation to our decision in *Helm v. State of Cal.,* 722 F.2d 507, 509–10 (9th Cir.1983), is entirely unpersuasive. The majority cites *Helm* as having applied the *Mindes* test to a constitutional claim against the military but not to an equitable estoppel claim, the inference apparently being that *Helm* supports the proposition that *Mindes* is no bar to an equitable estoppel claim. *Helm* provides scant support

for this proposition. The *Helm* court noted that the estoppel claim was not properly before it because plaintiff first raised that claim on appeal. *Id.* at 510. The court did state that "[e]ven had the issue been presented below, it is effectively precluded by *Lavin v. Marsh,* 644 F.2d 1378 (9th Cir.1981)." *Id.* As noted, *supra,* note 1, the parties did not raise the *Mindes* issue in *Lavin,* and the court did not address it.

"[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." 467 U.S. at 60, 104 S.Ct. at 2224. For this reason, "the Government may not be estopped on the same terms as any other litigant." *Id.* Accordingly, the courts require that "[a] party seeking to raise estoppel against the government must establish 'affirmative misconduct going beyond mere negligence'...." *Wagner v. Director, Federal Emergency Mgmt. Agency,* 847 F.2d 515, 519 (9th Cir.1988) (quoting *Morgan v. Heckler,* 779 F.2d 544, 545 (9th Cir.1985)).

The affirmative misconduct prerequisite to governmental estoppel insures that the citizenry's justifiable expectation that the government will enforce the laws uniformly will not be lightly disrupted. The majority fails to appreciate that its failure to give genuine substance to the affirmative misconduct element disrupts this expectation.

The majority concludes that "the Army affirmatively misrepresented in its official records throughout Watkins' fourteen-year military career that he was qualified for reenlistment." Maj. op. at 707. The misconduct the majority identifies is the Army's *failure* to enforce its long-standing policy against the enlistment of homosexuals.

The Army's prior practice of excusing Watkins' homosexuality, despite regulations precluding his reenlistment, simply was not *affirmative* misconduct. Equitable estoppel is triggered by "a definite misrepresentation of fact to another person...." *Heckler,* 467 U.S. at 59, 104 S.Ct. at 2223 (quoting the Restatement (Second) of Torts § 894(1) (1979)). In the context of governmental estoppel, therefore, the key issue is whether the government's definite misrepresentation of fact constitutes affirmative misconduct. The term affirmative suggests a distinction between misfeasance and nonfeasance, though these are "slippery terms." *Santiago v. Immigration & Naturalization Service,* 526 F.2d 488, 493 (9th Cir.1975) (en

banc), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

The Army's prior leniency and understanding in permitting Watkins to reenlist was not a promise or active representation by the Army that its regulation prohibiting homosexuals was a nullity. At most, the Army's conduct in reenlisting Watkins in the past created, *by inference,* a representation that the Army would overlook its regulation as to a particular enlistment period. Such apparent acquiescence or ambivalence does not meet the threshhold level of misfeasance needed to trigger equitable estoppel against the military.

Although the majority strives mightily to distance itself from the facts of *Lavin v. Marsh,* 644 F.2d 1378 (9th Cir.1981), that effort is ultimately unsuccessful. In *Lavin,* Army Reserve recruiters induced the plaintiff to enlist by emphasizing pension benefits, and the Reserve subsequently "led Lavin to believe he was working toward pension benefits." *Id.* at 1382. Nevertheless, the court held that the Army was not equitably estopped from enforcing a years-of-service regulation which required Lavin's removal from the service before he was eligible for pension benefits.

In this case, Watkins does not argue that the Army affirmatively informed him that he was not subject to its regulation against the enlistment of homosexuals. As *Lavin* demonstrates, however, even such a direct misrepresentation can fail to constitute affirmative misconduct. If the word "affirmative" is to have any meaning, the Army must do more than choose not to enforce strictly a regulation on its books.

The majority's confusion over the meaning of "affirmative misconduct" is evident. For example, the majority states that the Army "plainly acted affirmatively in admitting, reclassifying, reenlisting, retaining, and promoting Watkins." Opinion at 708. Does the majority really mean to suggest that the Army's reenlistment of Watkins was an act of misconduct? Surely not. Finally, the majority fails to assure that Watkins relied to his detriment on all cited

acts of affirmative misconduct.[13]

The *Lavin* decision is also especially instructive as to the reasonableness of Watkins' reliance upon his inferential understanding that his homosexuality would not impede his career in the Army. "Persons dealing with the government are charged with knowing government statutes and regulations, and they assume the risk that government agents may exceed their authority and provide misinformation." *Lavin*, 644 F.2d at 1383. Watkins simply was not justified in assuming that the Army's decision to accept a particular application for reenlistment would insure such acceptance *for all time.* New administrations must be allowed to pursue new policies so long as these policies do not run afoul of statutory or constitutional provisions. The majority greatly undermines the prerogative of executive officials to implement new programs and policies.

Finally, the majority concedes that the government may be estopped only where "the public's interest will not suffer undue damage by imposition of the liability." Opinion at 706–707 (quoting *Wagner*, 847 F.2d at 519). The majority attempts to finesse this issue by stating that the "harm to the public interest if reenlistment is not prevented is nonexistent.... [because] [p]laintiff has demonstrated that he is an excellent soldier." Opinion at 709. In other words, reenlisting Watkins will not harm the public interest because the majority thinks that the Army is better off with Watkins, even though he is a homosexual, than it would be without him.

The majority does not justify the ability of judges to substitute their assessment of a homosexual's impact on military preparedness for the Army's absent substantial federal interests. Courts are not particularly well-suited to determine whether individual homosexual servicemen bring more to the Army than they take from it. In any event, the majority fails even to under-

take this task, relying solely upon the undisputed fact that Watkins is an excellent soldier. The Army has concluded that having homosexual soldiers in the Army, even good soldiers like Watkins, interferes with the Army's mission. The majority does not challenge this assessment.

Furthermore, the majority fails to acknowledge the ramifications of its holding. We simply have no idea how many "known" homosexuals the Army has reenlisted in years past. By ignoring the ability of other homosexuals to invoke the equitable estoppel rationale advanced by the majority, it greatly minimizes the probable damage to the public interest, as judged by the Army.

## V

This dissent has explored the well-established case law which counsels against unnecessary judicial oversight of and intrusion into military matters. In so doing, I have explained how the *Mindes* doctrine serves as a necessary and logical way to avoid inappropriate inquiry into matters properly within the military's judgment. In my view, *Mindes* absolutely forecloses Watkins' claim that the Army is equitably estopped from refusing to reenlist him.

The majority's disposition of Watkins' equitable estoppel claim is essentially unprecedented. The majority's shallow treatment of precedent presents a misleading account of governing law. Finally, an examination of the merits of Watkins' estoppel claim proves that the majority has failed to heed the Supreme Court's admonition that the government is to be estopped only upon a showing of affirmative misconduct. Based upon the foregoing, I dissent.

TROTT, J., concurs in the dissent; BEEZER, J., concurs in parts I, II, III, and the first paragraph of part V; GOODWIN, C.J., concurs in parts I and III.

---

13. The majority quite rightly expresses its indignation and outrage at the Army's forged entry on Watkins' 1982 Reenlistment Data Card. The card indicated that the Army had informed Watkins of his ineligibility for reenlistment at an interview on July 29, 1981. The interview never

occurred. The Army's conduct is inexcusable, but its misconduct in this regard has no causal connection to Watkins' equitable estoppel claim. His claim actually centers on the Army's benign "misconduct" in certifying him qualified for reenlistment throughout his career.